UNITED STATES *v.* TAYLOR

No. 87–573.   Argued. April 25,1988—Decided June 24, 1988

BLACKMUN, J., delivered the opinion of the Court. in which REHNQUIST, C. J., and WHITE. O'CONNOR. and KENNEDY. JJ., joined, and in all but Part II–A of which SCALIA, J.. joined.   WHITE. J.. filed a concurring opinion, *post*, p. 344.   SCALIA. J.. filed an opinion concurring in part, *post*, p. 344.   STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ.. joined, *post*, p. 346.

*Edwin S. Kneedler* argued the cause for the United States. On the briefs were *Solicitor General Fried. Assistant Attorney General Weld. Deputy Solicitor General Bryson*, and *Harriet S. Shapiro.*

*Ian G. Loveseth*, by appointment of the Court, 485 U. S. 902, argued the cause and filed a brief for respondent.

JUSTICE BLACKMUN delivered the opinion of the Court.

This case requires us to consider the bounds of a district court's discretion to choose between dismissal with and with-

out prejudice, as a remedy for a violation of the Speedy Trial Act of 1974, as amended, 18 U. S. C. § 3161 *et seq.* (1982 ed. and Supp. IV).

## I

On July 25, 1984, respondent Larry Lee Taylor was indicted by a federal grand jury on charges of conspiracy to distribute cocaine and possession of 400 grams of cocaine with intent to distribute. His trial was scheduled to commence in the United States District Court for the Western District of Washington in Seattle on November 19, 1984, the day prior to the expiration of the 70-day period within which the Act requires the Government to bring an indicted individual to trial. See 18 U. S. C. § 3161(c)(1).[1] Respondent failed to appear for trial, and a bench warrant was issued for his arrest. On February 5, 1985, respondent was arrested by local police officers in San Mateo County, Cal., on state charges that subsequently were dismissed. Respondent's return to Seattle for his federal trial was delayed for a number of reasons, some related to his being required to testify as a defense witness in a federal narcotics prosecution then pending in San Francisco, and others involving slow processing, the convenience of the United States Marshals Service, and what the District Court would later describe as the "lackadaisical" attitude on the part of the Government. App. to Pet. for Cert. 30a. On April 24, 1985, while respondent was back in San Francisco to testify at a retrial of the narcotics prosecution, a federal grand jury in Seattle issued a superseding indictment against respondent, adding a failure-to-

---

[1] Section 3161(c)(1) reads:

"In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs. If a defendant consents in writing to be tried before a magistrate on a complaint, the trial shall commence within seventy days from the date of such consent."

appear charge based on his nonappearance at the scheduled November 19, 1984, trial.

Upon his return to Seattle, respondent moved to dismiss all charges against him, alleging that the Speedy Trial Act had been violated. The District Court rejected the Government's argument that because respondent had failed to appear for trial, the 70-day speedy trial clock began anew when respondent was arrested on February 5, 1985. After considering the time between respondent's nonappearance on November 19, 1984, and the issuance of the superseding indictment on April 24, 1985,[2] the court determined that the time respondent was at large, or testifying in the San Francisco prosecution, or being held on state charges, as well as some reasonable time for transporting him to Seattle, were excludable under 18 U. S. C. § 3161(h).[3] The District Court

---

[2] The Government's superseding indictment against respondent was issued without first dismissing the original indictment. The District Court apparently assumed that the period after April 24 was excludable because of the superseding indictment, see App. to Pet. for Cert. 29a; 821 F. 2d 1377, 1383 (CA9 1987). But cf. *United States* v. *Rojas-Contreras*, 474 U. S. 231, 234–235 (1985); *id.*, at 239–240 (BLACKMUN, J., concurring in judgment). Respondent has not challenged this assumption, presumably because he concluded that the period following April 24 was otherwise excludable under 18 U. S. C. § 3161(h). See Brief for Respondent 3.

[3] Section 3161(h) provides:

"The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:

"(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—

"(D) delay resulting from trial with respect to other charges against the defendant;

"(G) delay resulting from any proceeding relating to the transfer of a case or the removal of any defendant from another district under the Federal Rules of Criminal Procedure;

"(H) delay resulting from transportation of any defendant from another district, . . . except that any time consumed in excess of ten days from

concluded, however, that, despite these time exclusions, 15 nonexcludable days had passed, that the clock thus had expired 14 days before the superseding indictment, and that dismissal of the original indictment therefore was mandated. App. to Pet. for Cert. 27a–29a.[4]

The District Court found that, although respondent was charged with serious offenses, there was "no excuse for the government's lackadaisical behavior in this case." *Id.*, at 30a. The court observed that some of the Government's explanations for the various nonexcludable delays were inconsistent; that the Marshals Service failed to produce respondent expeditiously when requested to do so by a San Mateo County judge; and that even after the state charges were dropped, respondent was not immediately brought before a federal magistrate on the fugitive warrant. The District Court also noted that after an order issued to bring respondent back to Seattle for trial, the Government responded, but without "dispatch," accommodating the Marshals Service's interest in moving several prisoners at once instead of moving respondent within the time period provided for by the Act. It said:

> "[T]he court concludes that the administration of the [Act] and of justice would be seriously impaired if the

the date an order of removal or an order directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable;

"(3)(A) Any period of delay resulting from the absence or unavailability of the defendant or an essential witness."

[4] The 15 nonexcludable days included the 6 days between the end of the federal trial in San Francisco at which respondent was testifying and the date on which state charges against respondent were dropped; the 5 additional days after the state charges were dropped that it took the United States Marshals Service to bring respondent before a federal Magistrate on the federal bench warrant; and 4 days beyond the 10 days provided for by 18 U. S. C. § 3161(h)(1)(H) that the Marshals Service took to transport respondent back to Seattle. App. to Pet. for Cert. 28a–29a.

court were not to respond sternly to the instant violation. If the government's behavior in this case were to be tacitly condoned by dismissing the indictment without prejudice, then the [Act] would become a hollow guarantee." *Id.*, at 30a–31a.

The court dismissed the original counts with prejudice to reprosecution.[5]

A divided panel of the United States Court of Appeals for the Ninth Circuit affirmed. 821 F. 2d 1377 (1987). The full panel agreed with the District Court's holding that respondent's failure to appear for trial on November 19, 1984, should not restart the speedy trial clock, and confirmed the District Court's calculation of 15 nonexcludable days between respondent's flight and the issuance of the superseding indictment. *Id.*, at 1383–1385.

Applying an abuse-of-discretion standard, the Court of Appeals reviewed the District Court's discussion of its decision to dismiss the drug charges with prejudice. Characterizing the lower court's purpose as sending "a strong message to the government" that the Act must be "observed," even with respect to recaptured fugitives, the majority concluded: "Under the peculiar circumstances of this case, we see no need to disturb that ruling on appeal. The district court acted within the bounds of its discretion." *Id.*, at 1386.

The third judge concurred with the finding of a Speedy Trial Act violation, but concluded that the District Court abused its discretion in barring reprosecution. After reviewing the chronology and disputing whether, as a factual matter, the Government had failed to act reasonably, he felt that "none of the delay shown in this case—although admit-

---

[5] The District Court rejected respondent's motion to dismiss the failure-to-appear charge, finding that after subtracting the various time periods held excludable, the Government had not violated the 30-day arrest-to-indictment provision of § 3161(b). See App. to Pet. for Cert. 31a–32a. Respondent eventually entered a plea of guilty to this charge and was sentenced to five years' imprisonment.

tedly non-excludable under the statute — was of such studied, deliberate, and callous nature as to justify dismissal with prejudice." *Id.*, at 1387.

On the Government's petition, which suggested that further guidance was needed with respect to the application of the Speedy Trial Act's remedy provision, § 3162, we granted certiorari. 484 U. S. 1025 (1988).

## II

### A

Neither party has asked this Court to review the lower courts' decision that a violation of the Act actually occurred.[6] And the statute admits no ambiguity in its requirement that when such a violation has been demonstrated, "the information or indictment shall be dismissed on motion of the defendant." § 3162(a)(2). The only question before us, therefore, is whether the District Court abused its discretion under the Act in dismissing the indictment with prejudice rather than permitting reprosecution. In relevant part, the Act's remedy provision, § 3162(a)(2), instructs:

"If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by 3161(h),

---

[6] The Government asserts that both the District Court and the Court of Appeals relied on a "now-outmoded" method of calculating speedy trial time, and that under another now-favored method, there would have been 42 days of speedy trial time when respondent became a fugitive, and thus no speedy trial violation in this case. Brief for United States 5–6, n. 4. Inasmuch as that argument was neither raised below nor pressed here, we do not consider it.

The Government also argues that some of the time charged by the courts below as speedy trial time should have been excludable under § 3161(h)(1)(D) of the Act, see n. 3, *supra*, and thus that only 9 instead of 15 non-excludable days elapsed after respondent's capture. Brief for United States 24–26. Because, as is detailed below, our decision in this case does not turn on the distinction between a violation of 8 or of 14 days, we need not decide whether the District Court's application of the Act was erroneous in this respect.

> the information or indictment shall be dismissed on motion of the defendant. . . . In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice."

As is plain from this language, courts are not free simply to exercise their equitable powers in fashioning an appropriate remedy, but, in order to proceed under the Act, must consider at least the three specified factors. Because Congress employed somewhat broad and open-ended language, we turn briefly to the legislative history of the Act for some additional indication of how the contemplated choice of remedy should be made.

There apparently were those in Congress who thought courts should consider prejudice to the defendant before barring reprosecution. See 120 Cong. Rec. 41778 (1974) (remarks of Rep. Dennis); *id.*, at 41795 (remarks of Rep. Conyers). After suggesting that he might offer an amendment to add that factor to the statute's list of considerations for the court, Representative Dennis agreed to establish through "legislative history" the relevance of prejudice to the defendant. *Ibid.* Representative Cohen, the author of the compromise amendment, agreed that prejudice to the defendant was relevant, *id.*, at 41794–41795, but opposed adding that factor to § 3162(a)(2) for fear that district courts would treat a lack of prejudice to a defendant as dispositive:

> "[W]e [should] not consider it as a separate independent ground for the prosecution and open up to the Justice Department and the prosecutor to say we have not met the time limit and we did not take advantage of all the other time exemptions, but there is no prejudice to the defendant. I do not think that would be a sufficient basis in the consideration of the other factors to de-

termine if justice would be done." 120 Cong. Rec., at 41795.

Representative Cohen's amendment was thereafter adopted without further modification. Although the discussion in the House is inconclusive as to the weight to be given to the presence or absence of prejudice to the defendant, there is little doubt that Congress intended this factor to be relevant for a district court's consideration. See, e. g., *United States* v. *Kramer*, 827 F. 2d 1174, 1178 (CA8 1987); *United States* v. *Caparella*, 716 F. 2d 976, 980 (CA2 1983); *United States* v. *Bittle*, 226 U. S. App. D. C. 49, 56, 699 F. 2d 1201, 1208 (1983).[7]

The legislative history also confirms that, consistent with the language of the statute, Congress did not intend any particular type of dismissal to serve as the presumptive remedy for a Speedy Trial Act violation. Prior to the passage of the Act, the dismissal sanction generated substantial controversy in Congress, with proponents of uniformly barring reprosecution arguing that without such a remedy the Act would lack any real force, and opponents expressing fear that criminals would unjustly escape prosecution. See generally A. Partridge, Legislative History of Title I of the Speedy Trial Act of 1974, pp. 31–33 (Federal Judicial Center 1980); *United States* v. *Caparella*, 716 F. 2d, at 978–979 (reviewing legislative history). Eventually, in order to obtain passage of the Act, a compromise was reached that incorporated, through amendments on the floor of the House of Representatives, the language that eventually became § 3162(a)(2).

---

[7] Although, like JUSTICE SCALIA, we are all in favor of fostering the democratic process, we do not agree that the statutory text renders it "so obviou[s]," *post*, at 345, that the presence or absence of prejudice to the defendant is one of the "other factors" that a district court is required by the Speedy Trial Act to consider. A brief review of the floor debate, cited above, demonstrates that at least some Members of Congress were uncertain about, and repeatedly sought clarification of, precisely what they were voting for.

See 120 Cong. Rec. 41774–41775, 41778, 41793–41794 (1974). The thrust of the compromise was that the decision to dismiss with or without prejudice was left to the guided discretion of the district court, and that neither remedy was given priority.[8]  See, *e. g.*, *United States* v. *Kramer*, 827 F. 2d, at 1176; *United States* v. *Salgado-Hernandez*, 790 F. 2d 1265, 1267 (CA5), cert. denied, 479 U. S. 964 (1986); *United States* v. *Russo*, 741 F. 2d 1264, 1266–1267 (CA11 1984); *United States* v. *Caparella*, 716 F. 2d, at 980.

## B

Consistent with the prevailing view, the Court of Appeals stated that it would review the dismissal with prejudice under an abuse-of-discretion standard.  821 F. 2d, at 1385. See, *e. g.*, *United States* v. *Kramer*, 827 F. 2d, at 1179 (reversing dismissal with prejudice as abuse of discretion); *United States* v. *Russo*, 741 F. 2d, at 1267–1268 (reversing dismissal without prejudice as abuse of discretion); *United States* v. *Caparella*, 716 F. 2d, at 980–981 (same); *United States* v. *Salgado-Hernandez*, 790 F. 2d, at 1267 (upholding dismissal without prejudice as within District Court's discretion).  The court did not, however, articulate what that standard required.

---

[8] Because the provision at issue here was amended on the floor of the House, and that version was subsequently accepted by the Senate, we find largely unhelpful the preamendment Committee Report discussions, supporting dismissal with prejudice in all or most cases.  Similarly, a House Judiciary Committee statement, made five years later and while in the process of considering and recommending a temporary suspension of the dismissal sanction, to the effect that dismissal without prejudice should be "the exception and not the rule," H. R. Rep. No. 96–390, pp. 8–9 (1979), cannot override the contemporaneous legislative history and create a presumption that reprosecution will be barred.  In light of the compromise eventually reached, we are unwilling to read such a preference into the statute, which evinces no presumptions.  We are similarly disinclined to read a contrary presumption into a statute that began as a bill barring reprosecution in all cases, and was amended to provide for the current balancing test as a compromise.

This Court previously has recognized—even with respect to another statute the legislative history of which indicated that courts were to have "wide discretion exercising their equitable powers," 118 Cong. Rec. 7168 (1972), quoted in *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 421 (1975)—that "discretionary choices are not left to a court's 'inclination, but to its judgment; and its judgment is to be guided by sound legal principles.'" *Id.,* at 416, quoting *United States* v. *Burr,* 25 F. Cas. 30, 35 (No. 14,692d) (CC Va. 1807) (Marshall, C. J.). Thus, a decision calling for the exercise of judicial discretion "hardly means that it is unfettered by meaningful standards or shielded from thorough appellate review." *Albemarle Paper Co.,* 422 U. S., at 416.

Whether discretion has been abused depends, of course, on the bounds of that discretion and the principles that guide its exercise. Had Congress merely committed the choice of remedy to the discretion of district courts, without specifying factors to be considered, a district court would be expected to consider "all relevant public and private interest factors," and to balance those factors reasonably. *Piper Aircraft Co.* v. *Reyno,* 454 U. S. 235, 257 (1981). Appellate review of that determination necessarily would be limited, with the absence of legislatively identified standards or priorities.

In the Speedy Trial Act, however, Congress specifically and clearly instructed that courts *"shall consider,* among others, *each of the following factors,"* § 3162(a)(2) (emphasis added), and thereby put in place meaningful standards to guide appellate review. Although the role of an appellate court is not to substitute its judgment for that of the trial court, review must serve to ensure that the purposes of the Act and the legislative compromise it reflects are given effect. Where, as here, Congress has declared that a decision will be governed by consideration of particular factors, a district court must carefully consider those factors as applied to the particular case and, whatever its decision, clearly articulate their effect in order to permit meaningful appellate re-

view. Only then can an appellate court ascertain whether a district court has ignored or slighted a factor that Congress has deemed pertinent to the choice of remedy, thereby failing to act within the limits prescribed by Congress.

Factual findings of a district court are, of course, entitled to substantial deference and will be reversed only for clear error. *Anderson* v. *Bessemer City*, 470 U. S. 564 (1985). A judgment that must be arrived at by considering and applying statutory criteria, however, constitutes the application of law to fact and requires the reviewing court to undertake more substantive scrutiny to ensure that the judgment is supported in terms of the factors identified in the statute. Nevertheless, when the statutory factors are properly considered, and supporting factual findings are not clearly in error, the district court's judgment of how opposing considerations balance should not lightly be disturbed.

### III

Because the District Court did not fully explicate its reasons for dismissing with prejudice the substantive drug charges against respondent, we are left to speculate in response to some of the parties' arguments pro and con. Respondent, for example, argues that the District Court may have taken into account the fact that respondent's codefendant had been sentenced on the same charges to three years' imprisonment, and that by dismissing the drug charges but sentencing respondent to five years' imprisonment on the failure-to-appear charge, it would be possible to effect substantial justice while sending at the same time "a strong message" to the Marshals Service and the local United States Attorney. See Tr. of Oral Arg. 29, 32. There are several problems with that line of reasoning, not the least of which is that the District Court did not articulate it. To the extent that respondent is suggesting that his codefendant's 3-year sentence implies that the offenses with which both were charged were not "serious," his argument is directly at odds

with the District Court's statement expressly to the contrary: "there is no question that the drug violations with which [respondent] is charged are serious," App. to Pet. for Cert. 30a. We have no reason to doubt the court's conclusion in that regard. Moreover, at the time the District Court decided to dismiss the drug charges against respondent, he had not yet entered a plea to the failure-to-appear charge, so that the court could not be certain that any opportunity would arise to take the drug violations into account in sentencing.[9]

With regard to the second factor that the statute requires a court to consider, that is, the circumstances of the case leading to dismissal, we find it difficult to know what to make of the District Court's characterization of the Government's conduct as "lackadaisical." We do not dispute that a truly neglectful attitude on the part of the Government reasonably could be factored against it in a court's consideration of this issue, but the District Court gave no indication of the foundation for its conclusion. The court's discussion following that

---

[9] Even more important, respondent had not entered a guilty plea to, or been convicted of, the drug charges. It would have been highly improper—and we shall not presume the District Court assumed such unbridled discretion—to sentence respondent with undue harshness on one count, on the basis of the Court's untested and unsubstantiated assumption of what the facts might have been shown to be with regard to the drug charges, see Tr. of Oral Arg. 29–30, without the sort of inquiry conducted, in another context, under Federal Rule of Criminal Procedure 32. Although we realize it could be tempting to wrap up the "equities" in a single package and, with the best of intentions, effect what could be regarded as an essentially just result, we could not condone an approach that would violate the rights of defendants and misapply the Speedy Trial Act in the hope that the errors would balance out in the end. Contrary to the dissent's suggestion, see *post*, at 348–349, we do not question here the wisdom of Congress' decision to assess different penalties for failure to appear depending on the severity of the underlying charge. What we cannot countenance is a decision to punish someone more severely than would otherwise have been considered appropriate for the charged offense, solely for the reason that other charges had been dismissed under the Act.

statement merely recounted the Speedy Trial Act violations, and chastised the Government for failing to make "any particular show of concern," or to "respon[d] with dispatch." *Ibid.* The District Court did not find that the Government acted in bad faith with respect to respondent; neither did the court discover any pattern of neglect by the local United States Attorney, or evidence of what the Court of Appeals' majority later termed "the government's apparent antipathy toward a recaptured fugitive." 821 F. 2d, at 1386; see also Tr. of Oral Arg. 34–35.[10] Any such finding, suggesting something more than an isolated unwitting violation, would clearly have altered the balance. Instead, the extent of the District Court's explanation for its determination that "the second factor, . . . tends strongly to support the conclusion that the dismissal must be with prejudice," was that there was "no excuse" for the Government's conduct. App. to Pet. for Cert. 30a.

Then there is the fact of respondent's failure to appear. The Government was prepared to go to trial on the 69th day of the indictment-to-trial period, and it was respondent, not the prosecution, who prevented the trial from going forward in a timely fashion. Respondent argues that he has been charged separately and punished for his failure to appear for trial, that all the time he was at large has been excluded from the speedy trial calculation, and that the District Court therefore was correct in not considering his flight as a factor in deciding whether to bar reprosecution. Respondent also observes that the Court of Appeals held, and the Government does not dispute here, that his failure to appear for a trial scheduled with only one day remaining in the indictment-to-trial period does not restart the full 70-day

---

[10] The third judge on the panel noted that most of the 15-day delay seemed largely attributable to a misunderstanding about who was responsible for moving respondent before the state hold was lifted, and the happenstance that notification of the lifting of the state hold had come right before a weekend. See 821 F. 2d, at 1387.

speedy trial clock. See 821 F. 2d, at 1380–1383.[11] That respondent's flight does not restart the clock, however, goes only to whether there has been a violation of the Act, and not to what the appropriate remedy should be. Respondent's culpable conduct and, in particular, his responsibility for the failure to meet the timely trial schedule in the first instance are certainly relevant as "circumstances of the case which led to the dismissal," § 3162(a)(2), and weigh heavily in favor of permitting reprosecution. These factors, however, were considered by neither the District Court nor the Court of Appeals' majority.

The Government argues that the District Court failed to consider that the delay caused by the Government's unexcused conduct was brief, and that there was no consequential prejudice to respondent. The length of delay, a measure of the seriousness of the speedy trial violation, in some ways is closely related to the issue of the prejudice to the defendant. The longer the delay, the greater the presumptive or actual prejudice to the defendant, in terms of his ability to prepare for trial or the restrictions on his liberty:

> "[I]nordinate delay between public charge and trial, . . . wholly aside from possible prejudice to a defense on the merits, may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.'" *Barker* v. *Wingo,* 407 U. S. 514, 537 (1972) (WHITE, J.,

---

[11] A Department of Justice proposal to restart the 70-day period following recapture of a defendant who has fled prior to trial, see A. Partridge, Legislative History of Title I of the Speedy Trial Act of 1974, pp. 120–122 (Federal Judicial Center 1980), was rejected by Congress in favor of merely excluding "[a]ny period of delay resulting from the absence or unavailability of the defendant." § 3161(h)(3)(A).

concurring), quoting *United States* v. *Marion*, 404 U. S. 307, 320 (1971).[12]

The District Court found the Act's 70-day indictment-to-trial period here was exceeded by 14 nonexcludable days, but made no finding of prejudice. Indeed, the Court of Appeals concluded that the delay, "although not wholly insubstantial, was not so great as to mandate dismissal with prejudice." 821 F. 2d, at 1385. That court also found that there was no prejudice to respondent's trial preparation. *Ibid.* And, as respondent was being held to answer not only for the drug charges but also on a valid bench warrant issued after he did not appear, neither does there seem to have been any additional restrictions or burdens on his liberty as a result of the speedy trial violation.[13] Thus, although the absence of prejudice is not dispositive, in this case it is another consideration in favor of permitting reprosecution.

---

[12] In *Barker* v. *Wingo*, the Court articulated criteria by which the constitutional right to a speedy trial was to be judged, but declined to specify a time period within which a defendant must be brought to trial, leaving that kind of legislative or rulemaking activity to others better positioned to do so. 407 U. S., at 523. Congress now has taken up that responsibility and decreed that a defendant must be tried within 70 days of indictment, § 3161(c)(1), with certain exceptions for specified delays, § 3161(h). If the Government fails to try the defendant within the statutory time frame, the defendant is entitled to dismissal. Although Congress specified certain factors to be considered by the district court in deciding whether to bar reprosecution, it did not define a second threshold that must be crossed, whether in number of days or otherwise, before dismissal may be with prejudice. As in *Barker*, we decline to undertake such rulemaking. Indeed, during oral argument, the Government appeared to concede that it would be appropriate under some circumstances, as, for example, where there was a systemic problem with the procedures of a particular United States Attorney's Office, for a district court to bar reprosecution in a case involving a delay of only a few days. See Tr. of Oral Arg. 23.

[13] We do not decide that as a matter of law there could never be any prejudice to a defendant whose speedy trial rights were violated, but who was also being held on other charges. Because "prejudice" may take many forms, such determinations must be made on a case-by-case basis in the light of the facts.

The District Court's decision to dismiss with prejudice rested largely on its conclusion that the alternative would tacitly condone the Government's behavior, and that a stern response was appropriate in order to vindicate the guarantees of the Speedy Trial Act. We certainly encourage district courts to take seriously their responsibility to consider the "impact of a reprosecution on the administration" of justice and of the Act, § 3162(a)(2). It is self-evident that dismissal with prejudice always sends a stronger message than dismissal without prejudice, and is more likely to induce salutary changes in procedures, reducing pretrial delays. See Brief for United States 31. Nonetheless, the Act does not require dismissal with prejudice for every violation. Dismissal without prejudice is not a toothless sanction: it forces the Government to obtain a new indictment if it decides to reprosecute, and it exposes the prosecution to dismissal on statute of limitations grounds. Given the burdens borne by the prosecution and the effect of delay on the Government's ability to meet those burdens, substantial delay well may make reprosecution, even if permitted, unlikely. If the greater deterrent effect of barring reprosecution could alone support a decision to dismiss with prejudice, the consideration of the other factors identified in § 3162(a)(2) would be superfluous, and all violations would warrant barring reprosecution.[14]

Perhaps there was more to the District Court's decision than meets the eye. It is always difficult to review a cold appellate record and acquire a full understanding of all the

[14] The Speedy Trial Act also permits a district court directly to punish dilatory counsel, including a prosecutor, through a monetary fine, § 3162(b)(C), suspension from practice, § 3162(b)(D), or by filing a report with the appropriate disciplinary committee, § 3162(b)(E). That Congress expressly provided for these sanctions is further indication that the greater didactic effect of dismissal with prejudice should not by itself overcome what consideration of other factors would suggest is the appropriate remedy. Liberal use of direct sanctions may serve to "send a message" whenever one is warranted.

facts, nuances, and attitudes that influence a trial judge's decisionmaking, and we undertake such close review with reluctance. That is why the administration of the Speedy Trial Act and the necessity for thorough appellate review require that a district court carefully express its decision whether or not to bar reprosecution in terms of the guidelines specified by Congress. When the decision whether to bar reprosecution is analyzed in the framework established by the Act, it is evident from the record before us that the District Court abused its discretion in this case. The court did not explain how it factored in the seriousness of the offenses with which respondent stood charged. The District Court relied heavily on its unexplained characterization of the Government conduct as "lackadaisical," while failing to consider other relevant facts and circumstances leading to dismissal. Seemingly ignored were the brevity of the delay and the consequential lack of prejudice to respondent, as well as respondent's own illicit contribution to the delay. At bottom, the District Court appears to have decided to dismiss with prejudice in this case in order to send a strong message to the Government that unexcused delays will not be tolerated. That factor alone, by definition implicated in almost every Speedy Trial Act case, does not suffice to justify barring reprosecution in light of all the other circumstances present.[15]

## IV

Ordinarily, a trial court is endowed with great discretion to make decisions concerning trial schedules and to respond to abuse and delay where appropriate. The Speedy Trial Act, however, confines the exercise of that discretion more nar-

---

[15] As should be evident from our discussion about the nature of a district court's discretion under the Speedy Trial Act, see *supra*, at 336–337, we do not hold today, despite the dissent's suggestion, *post*, at 350, that a district court can "best avoid reversal by adopting a consistent practice of dismissing without prejudice." Indeed, we have expressly concluded that there is no presumption in favor of either form of dismissal. See *supra*, at 335, and n. 8.

rowly, mandating dismissal of the indictment upon violation of precise time limits, and specifying criteria to consider in deciding whether to bar reprosecution. The District Court failed to consider all the factors relevant to the choice of a remedy under the Act. What factors it did rely on were unsupported by factual findings or evidence in the record. We conclude that the District Court abused its discretion under the Act, and that the Court of Appeals erred in holding otherwise. Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE WHITE, concurring.

I join the Court's opinion, agreeing that when a defendant, through deliberate misconduct, interferes with compliance with the Speedy Trial Act and a violation of the Act then occurs, dismissal with prejudice should not be ordered unless the violation is caused by Government conduct that is much more serious than is revealed by this record.

JUSTICE SCALIA, concurring in part.

I join the opinion of the Court except Part II–A, which is largely devoted to establishing, through the floor debate in the House, (1) that prejudice to the defendant is one of the factors that the phrase "among others" in § 3162(a)(2) refers to, and (2) that that factor is not necessarily determinative. Both these points seem to me so utterly clear from the text of the legislation that there is no justification for resort to the legislative history. Assume that there was nothing in the legislative history except statements that, unless the defendant had been harmed by the delay, dismissal with prejudice could not be granted. Would we permit that to govern, even though the text of the provision does not consider that factor dominant enough to be mentioned specifically, but just includes it within the phrase "among othe[r] [factors]," or perhaps within the phrase "facts and circumstances of the case which led to the dismissal"? Or assume the opposite, that

there was nothing in the legislative history except statements that harm to the defendant could not be considered at all. Would we permit that to govern, even though impairment of the accused's defense is so obviously one of the "other factors" highly relevant to whether the Government should be permitted to reinstitute the prosecution?

I think the answer to both these questions is obviously no. The text is so unambiguous on these points that it must be assumed that what the Members of the House and the Senators thought they were voting for, and what the President thought he was approving when he signed the bill, was what the text plainly said, rather than what a few Representatives, or even a Committee Report, said it said. Where we are not prepared to be governed by what the legislative history says—to take, as it were, the bad with the good—we should not look to the legislative history at all. This text is eminently clear, and we should leave it at that.

It should not be thought that, simply because adverting to the legislative history produces the same result we would reach anyway, no harm is done. By perpetuating the view that legislative history *can* alter the meaning of even a clear statutory provision, we produce a legal culture in which the following statement could be made—taken from a portion of the floor debate alluded to in the Court's opinion:

"Mr. DENNIS. . . .

.        .        .        .        .

"I have an amendment here in my hand which could be offered, but if we can make up some legislative history which would do the same thing, I am willing to do it." 120 Cong. Rec. 41795 (1974).

We should not make the equivalency between making legislative history and making an amendment so plausible. It should not be possible, or at least should not be easy, to be sure of obtaining a particular result in this Court without making that result apparent on the face of the bill which both Houses consider and vote upon, which the President ap-

proves, and which, if it becomes law, the people must obey. I think we have an obligation to conduct our exegesis in a fashion which fosters that democratic process.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

This is the kind of case that reasonable judges may decide differently. The issues have been narrowed by the Government's abandonment of the two principal arguments that it advanced in the District Court and in the Court of Appeals.[1] But even on the remaining question whether the dismissal of two of the three counts pending against respondent should have been with or without prejudice, there is room for disagreement between conscientious and reasonable judges. The question, however, is one that district judges are in a much better position to answer wisely than are appellate judges.

A judge who has personally participated in the series of events that culminates in an order of dismissal has a much better understanding, not only of what actually happened, but also of the significance of certain events, than does a judge who must reconstruct that history from a confusing sequence of written orders and motions. Moreover, the trial judge is privy to certain information not always reflected in the appellate record, such as her impression of the demeanor and attitude[2] of the parties, her intentions in handling the future course of the proceedings, and her understanding of how

---

[1] The Government's primary submission in the lower courts was that the Speedy Trial Act's 70-day clock should have been restarted when Taylor was apprehended. See App. to Pet. for Cert. 26a–27a; 821 F. 2d 1377, 1380–1383 (CA9 1987). Its second submission was that even if the clock was not restarted, there was no violation of the Act. See App. to Pet. for Cert. 27a–29a; 821 F. 2d, at 1383–1385.

[2] As the majority recognizes, see *ante*, at 338–339, the Government's attitude concerning the administration of the Speedy Trial Act is a relevant factor in determining whether to dismiss an indictment with or without prejudice.

the limited issue faced on appeal fits within the larger factual and procedural context. I am convinced that in this case the District Judge made the sort of reasoned judgment that we as appellate judges would do well not to second-guess.

This is not a case in which dismissal with prejudice resulted in a dangerous criminal promptly returning to society without suffering substantial punishment for his wrongs. Rather, the District Court only dismissed the charges dealing with narcotics violations, while denying the motion to dismiss the failure-to-appear charge.[3] On that count, after respondent entered a guilty plea, the judge sentenced respondent to five years' imprisonment, the maximum permissible sentence. That sentence was more severe than the 3-year sentence she imposed on respondent's original codefendant who was found guilty on charges that paralleled the two dismissed counts.

The majority, however, declines to consider this important fact, concluding that it would have been improper for the District Judge to have given any weight to the presence of the remaining charge. I strongly disagree. Even though respondent was entitled to a presumption of innocence on the failure-to-appear charge, I believe it would be entirely proper to consider the strong possibility of conviction—given the fact that respondent's flight occurred shortly before his case was to be tried, the fact that a failure-to-appear prosecution generally does not involve even moderately complicated

---

[3] Although it is unlikely that he was actually unaware of the fact that the failure-to-appear charge remained pending against respondent, the opinion of the dissenting judge on the Court of Appeals incorrectly suggests on its face that no additional charges remained against respondent. He wrote:

"The district court dismissed the indictment *(and with it the entire case against the defendant)* with prejudice. I believe this was entirely uncalled for and constituted an abuse of allowable discretion." 821 F. 2d, at 1386 (emphasis supplied).

The mere possibility that the dissenting judge may have overlooked the fact that a charge remained against respondent illustrates the danger of second-guessing district courts in cases of this type.

issues of proof, and the further fact that the circumstances of his subsequent arrest and detention had been fully explored in connection with the motion to dismiss the narcotics charges—and to conclude that even if respondent was guilty of the narcotics charges, a dismissal with prejudice would not mean that he would return to society unpunished. Although "at the time the District Court decided to dismiss the drug charges against respondent, . . . the court could not be certain that any opportunity would arise to take the drug violations into account in sentencing," *ante*, at 338, the judge undoubtedly could have assumed that there was a high probability that the Government could prove its case. Nor would such an assumption have interfered with the presumption of innocence. The presumption is, after all, for the benefit of the accused and not the Government.

The majority further posits that it would have been "highly improper" for the judge in sentencing respondent on the failure-to-appear charge to consider the dismissed narcotics charges. In my view, just the contrary holds—the facts of the dismissed narcotics charges were highly relevant and should properly have been considered. The statute respondent was charged under defined two classes of violations, each carrying a different sentencing range. Under that statute, a defendant who failed to appear to face felony charges could be sentenced to up to five years' imprisonment, while a defendant who failed to appear to face misdemeanor charges could not be sentenced to more than one year's imprisonment. See 18 U. S. C. § 3150. For the same reason that the statute differentiated between those who fail to appear to face felony and misdemeanor charges, I would think that the severity of the pending charge would be relevant to the determination of where within the 5-year range to fix sentence. While flight to avoid a relatively minor felony charge would not generally merit a 5-year sentence (particularly in cases in which the possible sentence for the underlying charge is substantially less than five years), flight to avoid a murder trial

might well warrant the maximum sentence. In fact, the current statute now imposes four—rather than two—possible sentencing ranges, varying more acutely with the severity of the underlying alleged offense. See 18 U. S. C. § 3146 (1982 ed., Supp. IV).

In addition, the majority appears to assume that the District Judge intended to impose a higher sentence for the failure-to-appear charge based on her "untested and unsubstantiated assumption of what the facts might have been shown to be with regard to the drug charges." *Ante*, at 338, n. 9. Yet, there is no basis for Court's assumption that the judge planned to take into account the narcotics charge without informing the parties of her intention to do so and without permitting them the opportunity to proffer relevant evidence. Indeed, the concern the Court expresses today did not come to fruition in this case. Not only has respondent not complained of unfair treatment, his attorney informs us that respondent *requested* to be sentenced "for [his] total conduct." Tr. of Oral Arg. 32. The greater risk of unfair treatment is presented by the possibility that respondent will now be sentenced twice for the same misconduct.

Nor can I agree with the Court's conclusion that the District Court did not offer any "indication of the foundation for its conclusion" that the Government's conduct leading to the Speedy Trial violation was "lackadaisical." *Ante*, at 338. Of particular importance, the District Judge found that the clock ran, in part, as a result of the Marshals Service's failure to comply with a court order from a San Mateo County judge requiring that respondent be produced in state court. See App. to Pet. for Cert. 28a, 30a. Failure to comply with a court order is certainly a serious matter, and, if anything, the District Court's characterization of such a violation as "lackadaisical" appears understated. Although the dissenting judge on the Court of Appeals expressed the view that a state court judge cannot order that the United States Marshal produce a defendant and that respondent could have

been transferred to state custody at any time the local authorities arrived at the San Francisco County jail with the required papers, 821 F. 2d 1377, 1387 (CA9 1987), the important issue is not whether the Marshals Service was technically in contempt, but whether the Service acted carelessly or without regard for respondent's and the public's interest in seeing justice administered swiftly. This is precisely the sort of issue that is more difficult for an appellate court than for a district court to address.

On the record before us, I do not know whether I would have dismissed counts I and II with prejudice had I been confronted with the issue as a district judge. As a district judge, I would know that a dismissal without prejudice would be a rather meaningless sanction unless, of course, the statutes of limitations had run, in which event the choice between dismissal with and without prejudice would itself be meaningless. I would also know—especially if I had foreknowledge of the opinion announced today—that I could best avoid reversal by adopting a consistent practice of dismissing without prejudice, even though such a practice would undermine the years of labor that have gone into enacting and construing the Speedy Trial Act. I would have assumed, however, that the choice of remedy was one that was committed to my discretion and that if I set forth a sensible explanation for my choice that it would withstand appellate review.

Although the Court's opinion today boils down to a criticism of the adequacy of the District Judge's explanation for her ruling, see *ante*, at 342–343, her opinion identifies the correct statutory criteria and, in my view, proceeds to apply them in a clear and sensible fashion. After explaining why she found the Government's legal arguments to be without merit, she wrote:

> "To summarize the above discussion, the conclusion is inescapable that the government did violate the [Speedy Trial Act (STA)]. The court rules that, even allowing the government a full ten days to effectuate the defend-

ant's return to this district, there elapsed at least fourteen days of nonexcludable time in excess of the 70-day requirement set forth in § 3161(c)(1) prior to April 24, 1985, the date on which the government filed the superseding indictment against defendant. Therefore, pursuant to § 3162(2), Counts I and II of the . . . indictment must be dismissed. The real question is whether this dismissal should be with or without prejudice. On this point, the STA, § 3162(2), provides as follows:

" 'In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.'

"Regarding the first factor as applied to the instant case, there is no question that the drug violations with which the defendant is charged are serious. However, the second factor, the circumstances of the case leading to the dismissal, tends strongly to support the conclusion that the dismissal must be with prejudice. There is simply no excuse for the government's lackadaisical behavior in this case. Despite the government's insistence on the temporary nature of the federal custody from February 7 until February 28, 1985, the [United States Marshals Service (USMS)] did not return defendant to state authorities after the purported reason for that temporary custody had ended on February 22, 1985. Even more telling is the failure of the USMS to produce defendant on February 28, 1985 pursuant to a specific court order from a San Mateo County judge.

"After the state hold was dropped, it took the government six more days to arrange for defendant's initial appearance before a magistrate despite the fact that he had been in federal custody in the district for almost a

month. Nor did the order of removal issued on April 3 prompt any particular show of concern on the government's part. Instead of responding with dispatch, the government apparently placed more value on accommodating the convenience of the USMS than on complying with the plain language of the STA. Pursuant to the third factor, the court concludes that the administration of the STA and of justice would be seriously impaired if the court were not to respond sternly to the instant violation. If the government's behavior in this case were to be tacitly condoned by dismissing the indictment without prejudice, then the STA would become a hollow guarantee. Counts I and II of the . . . indictment must be dismissed with prejudice." App. to Pet. for Cert. 29a–31a (footnote omitted).

Congress enacted the Speedy Trial Act because of its concern that this Court's previous interpretations of the Sixth Amendment right to a speedy trial had drained the constitutional right of any "real meaning." [4] The Judiciary Committees in both the Senate and the House of Representatives recognized that unless violations of the Act generally required dismissals with prejudice—as was the rule in several States—the Act would be unlikely to accomplish its purposes. [5] As the Court correctly notes, this view was compro-

---

[4] The House Report notes:

"The Committee finds that the adoption of speedy trial legislation is necessary in order to give real meaning to that Sixth Amendment right. Thus far, neither the decisions of the Supreme Court nor the implementation of Rule 50(b) of the Federal Rules of Criminal Procedure, concerning plans for achieving the prompt disposition of criminal cases, provides the courts with adequate guidance on this question." H. R. Rep. No. 93–1508, p. 11 (1974).

[5] The House Committee on the Judiciary adopted the position of the American Bar Association concerning the need for dismissal with prejudice. See H. R. 17409, 93d Cong., 2d Sess., § 101 (1974). The Committee Report quotes the commentary accompanying the ABA Standards Relating to Speedy Trial:

mised by amendments during the floor debates.  See *ante*, at 334–335.  The compromise, however, was one that was intended to give district judges discretion to choose the proper remedy based on factors identified in Judge Rothstein's opinion in this case.  See 120 Cong. Rec. 41777–41778 (1974) (remarks of Reps. Cohen and Dennis).  If that discretion is not broad enough to sustain her decision, as the Court now concludes, the statute is surely nothing more than the "hollow guarantee" that she described.

I respectfully dissent.

---

" 'The position taken here is that the only effective remedy for denial of speedy trial is absolute and complete discharge.  If, following undue delay in going to trial, the prosecution is free to commence prosecution again for the same offense, subject only to the running of the statute of limitations, the right to speedy trial is largely meaningless.  Prosecutors who are free to commence another prosecution later have not been deterred from undue delay.' "  H. R. Rep. No. 93–1508, p. 37 (1974).

As the Committee Report further notes, Judge Zirpoli, the spokesman for the Judicial Conference also endorsed this view.  See *id.*, at 38.

Although admitting of qualification in cases involving "compelling evidence that the delay was caused by exceptional circumstances which the government and the court could not have foreseen or avoided," S. 754, 93d Cong., 2d Sess., § 101 (1974), the Senate Committee on the Judiciary agreed in principle with the position articulated by the American Bar Association, see S. Rep. No. 93–1021, p. 16 (1974).  See also Speedy Trial, Hearings on S. 895 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 92d Cong., 1st Sess., 21 (1971) (statement of Sen. Hart).