142 F.3d 441
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
United States of America, Plaintiff-Appellee,
v.
Timothy RUCKER and Noel Washington, also known as Joel
Robinson, Defendants-Appellants.
 No. 97-2923, 97-3034.
 United States Court of Appeals, Seventh Circuit.
 Argued February 27, 1998.
Decided May 5, 1998.
 
 Appeal from the United States District Court for the Eastern District of Wisconsin. No 97 CR 17 Charles N. Clevert, Judge.
 Before Hon. WALTER J. CUMMINGS, Hon. DANIEL A. MANION, Hon. TERENCE T. EVANS, Circuit Judges.
 
 ORDER
 
 1
 On April 17, 1996, Noel Washington, Otis Robinson, and Timothy Rucker robbed a bank in Milwaukee, Wisconsin. Washington and Rucker were subsequently indicted, apprehended, tried and convicted by a jury. In these consolidated appeals. Rucker argues there was insufficient evidence for a reasonable jury to convict him, and Washington argues that his conviction was the result of ineffective assistance of counsel because his attorney failed to argue that the government violated the Speedy Trial Act. We affirm Rucker's conviction and deny Washington's claim of ineffective assistance of counsel.
 
 I. Background
 
 2
 Noel Washington ("Washington"), also known as Joel Robinson, is the older brother of Otis Robinson ("Robinson"). Although both participated in a bank robbery, Robinson was a juvenile and was not indicted. Timothy Rucker and Washington are cousins who lived together at 7719 West Hampton Avenue in Milwaukee. Robinson would also occasionally stay there.
 
 
 3
 At 10:38 a.m. on April 17, 1996, Robinson, Washington and Rucker entered the First Financial Bank at 53rd Street and West Fond du Lac Avenue in Milwaukee, Wisconsin. They were wearing hats, jackets, latex gloves, and masks, and brandishing firearms. Upon their entering, Michelle Bey, the operations supervisor of the teller staff, pressed the silent alarm in the vault Robinson threw down his car keys, and climbed over the glass partition between the customers and the tellers. The keys fell at the feet of one of the bank customers, Pearl Hill, a 66-year old grandmother. Thinking quickly, Hill grabbed the keys and hid them in her pocket. Meanwhile, Washington ordered the bank supervisor to unlock the door to the tellers' area, and he joined Robinson, Robinson and Washington then directed Bey to take them to the vault. Once there, they stuffed $95,100 of U.S. currency into Mighty Morphin Power Ranger backpacks. Meanwhile, Rucker moved the bank customers into one area of the bank, while keeping his gun trained on them.
 
 
 4
 Before the robbers left, they noticed that Robinson's car keys were missing, and began to search for them. Mrs. Hill purposely misdirected them by stating that she thought the keys were on the teller side of the glass partition. After another minute of unsuccessful searching, they gave up the search and left the bank. During the search. Washington's and Robinson's masks came sufficiently loose to enable bank customers and employees to identify them.
 
 
 5
 Dwayne and Catherine Rick, who live in the vicinity of the bank, were at home on the morning of the April 17, 1996. Mrs. Rick saw two black males running through her yard. She called out to her husband, who went out to tell the trespassers not to cut through their yard. He saw three black males, two fairly tall, one shorter, cutting through more yards, and started to follow them. The shorter one turned and fired a shot at Mr. Rick, but missed. Shortly thereafter, at her front gate Mrs. Rick recovered two packets of bills. One had ten-dollar bills, the other had one-dollar bills. Both had bank wrappers on them. Mr. Rick continued to follow the robbers, but at a more discreet distance. Soon, however, he lost sight of them. As Mr. Rick reached 47th Street, he spotted what appeared to be the same three males, although they had removed their jackets and hats. He shouted out "You're the guys!" and they turned and started running again.
 
 
 6
 Washington and Rucker then ran to the nearby home of Helen Howard, a friend of the mother of Washington's son.[1] As Rucker and Washington approached the house. Washington dropped a green Nike jacket and a Georgetown Hoyas hat. Washington entered Howard's home, but seeing Sonny Lawrence in his car in front of Howard's house, Rucker did not follow Washington. Instead, Rucker got into Lawrence's car and tried to convince Lawrence to drive him away from the neighborhood. Lawrence refused. Then, Rucker joined Washington inside Howard's home. Alfred Howard (Helen's husband) came in from outside, and said that a bank had been robbed and that police were searching the area. Mrs. Howard asked Rucker and Washington if they were involved. They denied any involvement, and then Mrs. Howard told them to get out. They borrowed the keys to Helen Howard's niece's car and left together.
 
 
 7
 Meanwhile, shortly after Rucker, Washington and Robinson left the bank, the police arrived, followed by the FBI. At that time, Mrs. Hill gave the police the key-ring dropped by Robinson. The key-ring had a remote starter on it. Within two blocks of the bank, the FBI discovered a car which responded to the remote starter. This car was registered to Robinson. The police recovered in the 4200 block of 52nd Street, a black mask worn by one of the robbers; in the Ricks' yard on the 4200 block of 50th Street, the two bundles of money and latex gloves worn by the robbers; and at 4245 North 47th Street, two Mighty Morphin Power Ranger backpacks filled with money and red dye, a blue shirt, a Georgetown Hoyas hat,[2] a Houston Astros hat, a gun with one discharged round, and sunglasses. Helen Howard lives at 4225 North 47th Street.
 
 
 8
 On May 7, 1996, Rucker and Washington were indicted for armed bank robbery and use of a firearm in a violent crime. As the trial date approached, the government discovered that it was unable to locate key witnesses. On the government's motion, the indictment was dismissed without prejudice. On January 28, 1997, Washington and Rucker were reindicted on the same charges, and in April, 1997, a jury convicted both defendants. Because of the jury conviction, we view the facts drawn from the record and all reasonable inferences from those facts in a light most favorable to the government. United States v. Wingate, 128 F.3d 1157, 1158 (7th Cir.1997).
 
 II. Analysis
 A. Timothy Rucker
 
 9
 Rucker asserts that viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Meadows, 91 F.3d 851, 854 (7th Cir.1996). His primary contention is that no eyewitnesses placed him in the bank. While true, there is sufficient circumstantial evidence in the record that a rational trier of fact could conclude that Rucker was the third bank robber.
 
 
 10
 The evidence against Washington was overwhelming. It included eyewitnesses at the bank; eyewitnesses who put Washington near the bank soon after the robbery, wearing the same hat and jacket as one of the robbers; and recovery of weapons used in the robbery from the storage locker of Washington's girlfriend. The government's primary case against Rucker, however, was far more circumstantial. No eyewitnesses identified Rucker as a bank robber, although he met the general physical description of the third robber. Additionally, there are no fingerprints or other physical evidence linking Rucker to the crime scene. A shirt with a laundry mark "Rucker 7" was found near the bank, but witnesses in the bank stated that either Robinson or Washington wore the shirt, not the third robber.
 
 
 11
 If this were all of the evidence against Rucker, it would clearly be insufficient to sustain a conviction. However, several witnesses placed Rucker and Washington together, near the bank, shortly after the robbery, on foot. Sonny Lawrence testified that Rucker and "Joe" were together, running towards Mrs. Howard's house. Mrs. Howard's house was over six blocks from the bank, but a trail of evidence linked to the crime led from the bank to a yard on the same block as Mrs. Howard's residence. Lawrence also testified that "Joe" dropped a green and white Nike jacket and a blue and gray Georgetown Hoyas baseball cap. A friend quickly picked them up and later actually sold the green jacket to Lawrence and the baseball cap to someone else. The bank surveillance tape clearly shows one robber wearing both of these items. A few minutes later, Lawrence entered the Howard's residence and saw the two males. Helen Howard and others identified the second male as Washington. The jury could permissibly infer that for Rucker to be with Washington before Washington had the opportunity to discard the apparel worn in the robbery, Rucker must have been involved in the robbery.
 
 
 12
 There was still more evidence that Rucker was involved. Lawrence testified that police were searching the neighborhood, and instead of entering the Howard residence with Washington, Rucker asked Lawrence for a ride away from the neighborhood. When Lawrence refused (because Rucker did not have $20.00) Rucker went into the house. A short time later, Rucker and Washington borrowed a car from Helen Howard's niece and left together. The jury could reasonably infer that Rucker's desire to leave the neighborhood and his willingness to ask a stranger for a ride was motivated by a fear of getting caught. While this is circumstantial evidence, it is nonetheless probative evidence of guilt. The jury was entitled to believe Lawrence's testimony, and his testimony placed Rucker and Washington together, near the bank, while Washington was still wearing clothing he wore in the bank. Moreover, Rucker's unusual conduct of soliciting transportation from someone he did not know supported the government's theory that Rucker was attempting to flee the vicinity of the bank because by hiding the car keys, Pearl Hill had foiled his getaway plan.
 
 
 13
 Although Rucker does not cite it, this case is nevertheless properly distinguished from United States v. Grose, 525 F.2d 1115, 1120 (7th Cir.1975), where this court did reverse a bank robbery conviction due to insufficient evidence. In Grose, the government accused James Eaton of driving the getaway car in a bank robbery. Eaton was seen with the identified bank robber five hours after the robbery, and again four days later in Chicago. Also, Eaton left for Chicago from Milwaukee on the night of the robbery. We reversed Eaton's conviction after concluding that the "fatal gap in the Government's case is its failure to place defendant Eaton near the [robbed bank] on the morning of the robbery." Id. Rucker cannot make the same complaint. Sonny Lawrence, Helen Howard, and others spotted Rucker with Washington just minutes after the robbery on foot near the bank. A rational jury could have relied on this evidence to conclude that Rucker participated in the robbery.
 
 B. Noel Washington
 
 14
 Washington does not attempt to challenge the sufficiency of evidence that included eyewitness identification and money and weapons tied directly to him. Instead, he argues that his trial counsel was ineffective because counsel failed to move the district court to dismiss the indictment under the Speedy Trial Act. Ordinarily, we steer clear of ineffective assistance of counsel claims on direct appeal, but here the record is sufficiently developed to permit our review. United States v. Levine, 5 F.3d 1100, 1108 (7th Cir.1993), cert. denied, 510 U.S. 1180, 114 S.Ct. 1224, 127 L.Ed.2d 569 (1994). Also, Washington's attorney insists that now, rather than in a habeas challenge, is the time to consider the issue. Under Strickland v. Washington, Washington must demonstrate that his attorney committed serious errors that "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 687-88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). There is a "strong presumption that counsel rendered reasonably effective assistance," United States v. Limehouse, 950 F.2d 501, 503 (7th Cir.1991) (citing Strickland, 466 U.S. at 689), and that the challenged conduct "might be considered a sound trial strategy." Strickland, 466 U.S. at 689 (citation and quotation omitted). Moreover, failure to satisfy either the performance or the prejudice prong of the Strickland test is fatal to a defendant's ineffectiveness claim. See Velarde v. United States, 972 F.2d 826, 828 (7th Cir.1992).
 
 
 15
 Washington claims that more than 70 days (the allowable length of time under the Speedy Trial Act (STA), 18 U.S.C. § 3161) elapsed between his first indictment and eventual trial. He further claims that because his attorney did not seek dismissal on account of the possible STA violation, his attorney rendered constitutionally ineffective assistance of counsel. On the merits of the STA claim, it is not at all clear that the STA was violated. There are three relevant time periods in dispute, and each has at least an arguable basis for being excluded from calculations under the STA. Under 18 U .S.C. § 3161(h)(7), "the excludable delay of one defendant may be ascribed to all co-defendants in the same case, absent severance." United States v. Tanner, 941 F.2d 574, 580 (7th Cir.1991), cert. denied, 502 U.S. 1102, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992). On June 5, 1996, Rucker filed a reply brief in support of his motion to suppress evidence. Then, on June 14, 1996, Rucker filed a supplemental affidavit in support of the motion. If the district court reasonably expected to receive the affidavit, then this time period would be excluded from the STA calculation. Henderson v. United States, 476 U.S. 321, 329-330, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986). There is no indication in the record that the magistrate judge was surprised by the filing; indeed, she referred to the affidavit in her decision. On the record before us, the magistrate judge could reasonably expect to receive the affidavit.[3] On August 20, 1996, the district court approved the recommendation of the magistrate judge on the suppression motion, and the next day Rucker filed a pro se objection to the magistrate judge's findings. Although no action was taken on it before the indictment was dismissed on September 9, 1996, this pretrial motion may have been construed as a motion to reconsider, and would toll the STA, although no action was taken on it before the indictment was dismissed on September 9, 1996. On February 25, 1997, the magistrate judge handling the pre-trial procedures under the second indictment ordered that pretrial motions should be filed within a fixed deadline. On March 8, 1997, a pretrial motion was filed. Washington concedes on appeal that this time period is excludable from STA under United States v. Montoya, 827 F.2d 143, 153 (7th Cir.1978). However, he asks us to reconsider this precedent, but in the absence of such a challenge being presented to the district court we decline. Further, we see no likely scenario in which failing to argue that established precedent ought to be changed amounts to ineffective assistance of counsel Government of the Virgin Islands v. Forte, 865 F.2d 59, 62 (3d Cir.1989). Thus, we conclude that the Speedy Trial Act was not violated.
 
 
 16
 However, even if the STA had been violated, there are strategic reasons which would support a decision to forego raising the STA violation. Washington's attorney may have concluded that the dismissal would be without prejudice, which would simply result in another indictment and trial. When a district court determines that a defendant's Speedy Trial rights have been violated, the court retains the discretion to dismiss the indictment with or without prejudice. See 18 U.S.C. § 3162(a)(2). The STA does not favor either remedy. United States v. Taylor, 487 U.S. 326, 335, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988). Moreover, if Washington had sought a dismissal under the STA and Rucker had not, the trial might have been severed. As Rucker and Washington appeared to have supporting alibis, Washington's attorney may have concluded that severing Washington's trial from Rucker's would be disadvantageous. Of course, Washington's counsel may also have concluded that in fact the STA was not violated.
 
 
 17
 Washington also has failed to establish prejudice (the second prong under Strickland ). In particular, he does not suggest that the delay interfered with his ability to obtain key testimony or present evidence, or that it made the trial unfair. In fact, a key government witness was conveniently vague because the incident happened "so long ago." Washington merely asserts that he should not have been required to stand trial at all, and that this matter should be remanded to the district court to determine whether the indictment should be dismissed with prejudice. 18 U.S.C. § 3162(a)(2). Washington relies primarily on United States v. Palomba, 31 F.3d 1456, 1464-66 (9th Cir.1994). In Palomba, a superseding indictment contained untimely charges for which the defendant was ultimately convicted. The Ninth Circuit concluded that trial counsel's failure to seek dismissal of untimely charges in an indictment was prejudicial error, and therefore ineffective assistance of counsel. The key difference between Palomba and this case is that the additional charges which should have been dismissed in Palomba create prejudice because of criminal history enhancements and recidivist statutes. As the STA 70-day violation in this case does not result in these types of prejudices, and the trial itself is not argued to have been unfair, the Palomba holding is not applicable.
 
 
 18
 In sum, we find no plain error involving the STA. Tactical reasons support not raising a possible STA violation, and there is no evidence that the trial result would have been different had the STA violation been raised. Thus, we deny Washington's claim of ineffective assistance of counsel.
 
 III. Conclusion
 
 19
 Eyewitnesses placed Rucker with Washington immediately after the robbery, in the vicinity of the bank. This, along with the other evidence introduced at trial, is sufficient to sustain Rucker's conviction. We also conclude that Washington's trial counsel did not provide ineffective assistance of counsel for failing to raise a possible violation of the Speedy Trial Act.
 
 
 20
 AFFIRMED.
 
 
 
 [1]
 Robinson apparently hid in a garage nearby. Mr. Rick encountered one of the robbers from the bank, but was unable to identify which. His description would fit either Robinson or Rucker. Because Robinson was not a defendant, much of his post-robbery activities do not appear in the record
 
 
 [2]
 This hat, exhibit 14, is a solid dark blue hat with the word "Hoyas" embroidered on the front. The cap which Lawrence saw Washington discard, exhibit 26, is a blue hat, with a distinctive gray patch on the right side, and a large "G" and "Georgetown" embroidered on the front. The surveillance video clearly shows that the robber wearing the green Nike jacket was also wearing exhibit 26 and not exhibit 14
 
 
 [3]
 Perhaps if this claim had been brought to the attention of the district court through a § 2255 proceeding, a record could have been developed supporting this claim. However, at oral argument, Washington's counsel acknowledged that he was forgoing the opportunity to develop a record for a habeas challenge, and was proceeding solely on the record of the lower court