**UNITED STATES of America, Plaintiff,**

v.

**Ricky NEJDL, Harlan D. Porter, Richard Avila, and Edmond C. Emery, Defendants.**

**No. CR 90-O-42.**

United States District Court, D. Nebraska.

July 29, 1991.

---

Donald L. Schense, Sp. Asst. U.S. Atty., for plaintiff.

James Martin Davis, Fred J. Ferraro, Fred Brown, Brian P. Sapone, Omaha, Neb., for defendants.

## MEMORANDUM, ORDER AND JUDGMENT

STROM, Chief Judge.

This matter is before the Court on the findings and recommendations of the magistrate judge (Filing No. 140), and the defendants' motion for additional hearing and arguments and objections to such findings and recommendations (Filing No. 141).

The Court has reviewed de novo the portions of the findings and recommendations to which objections have been made pursuant to 28 U.S.C. § 636(b)(1)(C) and Local Rule 49(B), and finds that the objections should be overruled, and the findings and recommendations should be adopted.

IT IS ORDERED:

1) That the findings and recommendations of the magistrate judge (Filing No. 140) are adopted;

2) That the defendants' motion for additional hearing and argument and objections (Filing No. 141) are overruled;

3) That this case is dismissed without prejudice;

4) Accordingly, the defendants' motions to dismiss (Filing Nos. 75, 76, 77, and 78) are granted in part and denied in part; and

5) The time in excess of thirty (30) days when the defendants' motions to dismiss were under submission is deemed excludable time pursuant to the provisions of 18 U.S.C. § 3161(h)(8)(A) & (B) for the reason that although the time expended by the magistrate judge (from April 4, 1991, to the date of the report and recommendation) exceeded thirty (30) days, the ends of justice were served by taking such time and

outweigh the best interests of the public and the defendant in a speedy trial because analysis of the evidentiary hearing record, comprising four days of testimony, confronted the magistrate judge with unusual and complex matters presenting novel questions of fact and law.

UNITED STATES OF AMERICA,
Plaintiff,

vs.

MICHAEL J. KOORY, Defendant.

UNITED STATES OF AMERICA,
Plaintiff,

vs.

RICKY NEJDL, HARLAN D. PORTER, RICHARD AVILA, and EDMOND C. EMERY, Defendants.

Nos. CR 90–0–40, CR 90–0–42.

MAGISTRATE'S REPORT AND RECOMMENDATION

RICHARD G. KOPF, United States Magistrate Judge.

The defendants in each [1] of these cases have moved to dismiss, claiming a violation of the Speedy Trial Act of 1974 (the Act), 18 U.S.C. § 3161, *et seq.* The government concedes that the Act has been violated in each of these cases and that dismissal is demanded. However, the government argues that dismissal should be without prejudice. The defendants argue that dismissal should be with prejudice.

I shall recommend that each of these cases be dismissed without prejudice.

## I. FACTS

After four days of evidentiary hearings, this matter was submitted to me on April 4, 1991, with substantial oral argument. Based upon the evidence received and the arguments of counsel, the following is evident.

### A.

These cases are similar in many ways. The case against Michael J. Koory (CR 90–0–40, hereinafter referred to as the "Koory case") arises by virtue of an indictment filed April 25, 1990. Koory is charged in count I of that indictment with knowing and intentional possession with intent to distribute cocaine in or about, or within 1,000 feet, of the real property comprising an elementary school in violation of 21 U.S.C. § 841(a) and 21 U.S.C. § 845a, now codified at 21 U.S.C. § 860. Koory is charged in count II of the indictment with being in possession of three pistols and one assault pistol during and in relationship to a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1).

Defendants Ricky Nejdl, Harlan D. Porter, Richard Avila, and Edmond C. Emery (CR 90–0–42, hereinafter collectively referred to as the "Nejdl case," unless otherwise indicated) are also charged in an indictment filed April 25, 1990. The defendants are charged in count I of that indictment with knowing and intentional distribution of marijuana in or about, or within 1,000 feet, of the real property comprising a public vocational school in violation of 21 U.S.C. § 841(a) and 21 U.S.C. § 845a, now codified at 21 U.S.C. § 860. In count II of the indictment defendant Ricky Nejdl is charged with knowing and intentional possession with intent to distribute marijuana within 1,000 feet of the real property comprising a public vocational school in violation of 21 U.S.C. § 841(a) and 21 U.S.C. § 845a, now codified at 21 U.S.C. § 860.

Beyond the fact that both of these cases are so-called "school-zone cases" and both were subject to indictments filed the same day, there are additional similarities. With the exception of Harlan D. Porter, all of the defendants in these cases have previously been charged in state court with state felonies based upon the same facts which gave rise to the instant indictments. Donald L. Schense (Schense), the local

---

**1.** The government and the defendants agreed that these cases should be consolidated for consideration of the motions since the same issue is raised in both cases.

county attorney handling the state cases, was also the special assistant United States Attorney who handled these cases.

The evidence reveals that the Office of the United States Attorney for the District of Nebraska and the Office of the County Attorney for Douglas County, Nebraska, have been cooperating with regard to the prosecution of certain drug cases. Pursuant to an understanding between the United States Attorney for the District of Nebraska and the County Attorney for Douglas County, Nebraska, Donald Schense caused the state cases to be dismissed and he sought, and received, indictments from the federal grand jury, thereby initiating these federal cases.

The Koory case was commenced in state court about the third week of March, 1990 (Defendants' Exhibit 5). The Nejdl case was commenced in state court at approximately the same time (Defendants' Exhibit 6). Defendant Porter, however, was not charged in state court.

The Koory case filed in state court involved unlawful possession with intent to deliver a controlled substance and use of a firearm to commit a felony in violation of the laws of the State of Nebraska (Defendants' Exhibit 5). The Nejdl case filed in state court involved unlawful delivery of a controlled substance and unlawful possession with intent to deliver a controlled substance in violation of the laws of the State of Nebraska (Defendants' Exhibit 6). There is no doubt, and the government concedes, that the state and federal prosecutions are based upon the same transactions.

In each of these cases the defendants admit the crimes with which they are charged are serious. According to the government, the Koory case involves the alleged distribution of cocaine and the use of firearms in relationship to a drug-trafficking crime, and the Nejdl case involves the alleged distribution or possession of pound quantities of marijuana.

### B.

The government admits that the Act has run. Schense admits it was his negligence which allowed the Act to run, but he advises the court that he was relatively unfamiliar with the provisions of the Act. Schense attributes his lack of familiarity with the Act to the fact that at the time these cases were being prosecuted his legal background was that of a state court prosecutor. Schense also advises, and there is no dispute about this, that the Nebraska speedy trial statutory guidelines are different from those of the Act. Schense further advises that during the relevant period of time, he was responsible for state cases before 12 separate judges.

The parties have stipulated that if Schense were called to testify as a witness he would testify as follows:

1. That he is a Deputy Douglas County Attorney prosecuting criminal cases in the courts of Douglas County, Nebraska. He is also a Special Assistant United States Attorney prosecuting narcotics cases in the United States District Court for the District of Nebraska. He is the prosecutor who was primarily assigned the responsibility of handling the above cases.

2. During the time period in which he was handling the above cases in federal court, he was also managing a case load in front of 12 judges in the state court system. There are different Speedy Trial requirements in state and federal court with Nebraska state law requiring that cases be brought to trial within 6 months while in federal court there is a 70 day limit.

3. The failure to bring the above matters to trial within the confines of the Speedy Trial Act was not intentional. It was also not done for the purpose of obtaining tactical advantage. Rather, he was not aware at the time that the time limits of the Speedy Trial Act ran in the above cases that the cases were at or near the limits of the Act.

4. With regard to the cases involving Harlan Porter and Edmund [*sic*] Emery, Donald Schense would testify that he had been involved in active

negotiations with counsel for those defendants and that he believed that those cases would be resolved without the necessity of having a jury trial.

Plaintiff's Exhibit 105.

At the time the motion for dismissal was filed in the Koory case, approximately 129 days had elapsed as includable time under the Act. In calculating the time included under the Act, I find that the time between April 27, 1990, and May 17, 1990, and the time between September 15, 1990, and December 31, 1990, is includable time under the Act. Accordingly, there was a violation of the 70–days–to–trial limitation under the Act of approximately 59 days.

At the time the motions for dismissal were filed in the Nejdl case, I find that approximately 145 days had elapsed as includable time under the Act. I find that the time between May 7, 1990, and May 17, 1990, the time between August 13, 1990, and August 22, 1990, the time between August 27, 1990, and October 2, 1990, and the time between October 9, 1990, and January 3, 1991, is includable time under the Act. Accordingly, there was a violation of the 70–days–to–trial limitation under the Act of approximately 75 days.

### C.

The evidence regarding prejudice to the defendants takes a variety of forms. Generally speaking, however, the defendants do not claim that the government obtained a tactical advantage by virtue of the violation of the Act. Nor do the defendants claim that they have lost any particular evidence or that witnesses have become unavailable.

The defendants argue that they have suffered prejudice as a result of the anxiety they and their families have experienced, that some of the defendants have spent all the money they have to hire lawyers, and that some of the defendants have lost employment opportunities as a result of the delay. All of the defendants chafe under what they consider strict conditions of pretrial release.

Defendant Michael J. Koory (Koory) testified that he is 47 years old, married, and the father of four children. He operates a shoe repair business which he purchased in December, 1987. He has only one employee. Koory testified that he was arrested by the Douglas County Sheriff March 23, 1990, and spent approximately two weeks in jail thereafter. He was able to make bond on the state charges at 10% of $150,-000. When the state charges were dismissed, Koory received $13,500 from the exoneration of his bond, and the state kept $1,500 as a fee. Koory paid an attorney $1,000 to represent him in state court and gave his present lawyer $7,500 to represent him in federal court. Koory obtained this money by borrowing on his credit cards. During the pendency of these proceedings, Koory sold his home because of financial difficulties. No evidence was presented to suggest that the loss of the home was the result of the violation of the Act, and Koory lost his home well before the Act had expired. He and his family now reside in a trailer home.

Koory testified that the thought of reprosecution frightens him, particularly when he considers its effect on his family. He indicated that his young son is very upset by the prospect of losing his father, and the older girls are having trouble in school. Koory described a family under significant emotional stress. He also indicated he has lost business as a result of this prosecution and must take approximately two hours away from his work every Monday to go to the United States Pretrial Services Office and to provide urine samples.

On cross-examination Koory admitted twice being prosecuted and convicted for felonies. He was convicted in California in 1965 and served time for a felony murder associated with a burglary. In that case the victim died of a heart attack during the commission of the crime. He was also convicted in federal court in 1980 of smuggling cocaine from Canada. He served one year and one day of his federal sentence and was released in 1981.

Koory did not dispute his psychiatric social worker's observation that he was "doing well," and he did not dispute her obser-

vation that his family was "now doing well." Koory further admitted on cross-examination that the federal prosecution has not caused additional stress when compared to the state prosecution. He also admitted that reporting to the pretrial services officer was "not that much of a hardship."

Carla Nejdl, wife of defendant Ricky Nejdl (Nejdl), testified. She indicated that she and Nejdl had been married for 11 years and had three children, all of whom were especially upset by the searches which took place incident to Nejdl's arrest. Carla Nejdl testified that her family suffers stress as a result of this prosecution and that they cannot afford to hire another lawyer in the event of reprosecution. She testified that she posted a state bond for her husband of 10% of $33,000 and lost about $300 when the bond was exonerated.

On cross-examination Carla Nejdl admitted that the pretrial services officer had not come to her home. She further admitted that her husband had one conviction for misdemeanor possession of marijuana for which he served six months in jail.

Defendant Nejdl testified, stating that he could not afford to hire a new lawyer if reprosecuted. He further testified that he had lost money because he was required to attend hearings in court.

Defendant Richard Avila (Avila) testified. He said he was in jail on the state charges approximately one or two nights before he was able to secure bond by posting 10% of $50,000. When that bond was exonerated in state court, Avila received $4,500 which he gave to his lawyer to represent him in this case.

Avila testified that the order setting conditions of release in his case was revoked in August, 1990, because he was twice charged with driving while under the influence of alcohol and because he had a urinalysis which was positive for controlled substances. He testified that the order setting conditions of release was withdrawn and he was in jail from August 24, 1990, until his release pursuant to another order setting conditions of release on or about October 9, 1990. Among other things, the new order setting conditions of release required Avila to call in daily, report in person weekly, reside with his parents and not leave without their approval, and obtain an Alcoholics Anonymous sponsor. Avila stated that he lost a leg in December, 1989, and that further surgery is needed before a permanent prosthesis can be made. He testified that the surgery required would take about two weeks and because of this prosecution he has not been able to seek either the surgery or the vocational rehabilitation he needs. As a result, he has been unable to work.

On cross-examination Avila admitted he had a prior felony conviction. He was sentenced to serve one to three years in the Nebraska penal complex.

Avila's father, Richard A. Latino, testified that this prosecution had caused his family to suffer stress and that his son had not been able to undergo vocational rehabilitation because of this prosecution.

Defendant Harlan D. Porter (Porter) testified that he is 28 years old, married, and the father of three children. Porter was not charged in state court. He testified that this prosecution has been devastating for him and his family and he cannot sleep, does not eat, and is depressed. This stress caused Porter and his wife to separate for a week or so, but they have been reconciled. Mrs. Porter is now expecting another child. Porter testified that his two older children are quite anxious about the prosecution and are worried about his not coming back. He also testified that the reporting requirements of the order setting conditions of release have kept him from accepting employment through a labor union because the reporting times conflict with the time for appearing at a hiring hall.

On cross-examination Porter admitted he had not sought or received any treatment or medication for his anxiety and depression. He further admitted that in February, 1986, he was sentenced to serve one to three years in the Nebraska penal correctional complex on a state drug charge.

Defendant Edmond C. Emery (Emery) testified that he was arrested on state

charges and posted bond of 10% of $33,000. The state deducted a fee of $300 when his bond was exonerated. Emery stated he was particularly embarrassed by having to give urine samples as a condition of pretrial release in this case. He also testified that he worked as a roofer and had lost approximately $100 per month in income because of the necessity of attending various hearings in this case. This in turn has made it difficult for him to make his child support payments of $235 per month. Emery further testified that his employer told him he was passed over for a $3-per-hour raise and a promotion to superintendent because he missed a good deal of work as result of this prosecution. On cross-examination Emery admitted he suffered no particular physical or emotional problems.

Defense counsel in this case retained a psychiatric social worker, Karen Hacker (Ms. Hacker), to interview certain of their clients. Ms. Hacker interviewed Koory, his wife, and their children. She also interviewed Carla Nejdl and two of her children, but did not interview defendant Nejdl. Ms. Hacker also interviewed defendant Porter and his wife.

Ms. Hacker testified that all of the people she interviewed were undergoing stress as a result of this prosecution. Other than stress, however, Ms. Hacker was unable to diagnose illness in any of those interviewed. She did not refer any of them for further psychiatric or psychological counseling, but she did suggest to defendant Porter that he should seek counseling for his alcohol dependency.

Donald A. Ranheim (Ranheim), United States Pretrial Services Officer for the District of Nebraska, was called to testify as a witness for the defense. Ranheim testified that all of the defendants except Koory and Avila had been released pursuant to a standard order setting conditions of release in drug cases in this district.

As special conditions of release, the standard order setting conditions of release in a drug case in this district requires a defendant to maintain or actively seek employment, not leave the State of Nebraska, report to the United States Pretrial Services Office on a regular basis as directed, refrain from possessing a firearm, destructive device, or other dangerous weapon, refrain from excessive use of alcohol or any use or possession of an unlawful controlled substance, undergo a drug evaluation if requested by the Pretrial Services Office and follow the recommendations of that evaluation, submit to blood, breath, or urine testing by the Pretrial Services Office to monitor drug usage, submit to a search of his/her person, place of residence, or auto upon the request of law enforcement authorities or pretrial services personnel, and not loiter in or about a school (e.g., Defendants' Exhibit 1).

In addition, Koory was also required to post a cash bond in the sum of $13,500 (Filing 12), later reduced to $5,000 (Filing 24). Koory spent approximately three days in federal custody prior to being released.

In the case of Avila, Avila was originally released on a standard order setting conditions of release in a drug case, but because of violations of the order setting conditions of release having to do with charges in state court related to driving while under the influence of alcohol and a positive urinalysis result for controlled substances, Avila's order setting conditions of release was revoked. Avila was twice evaluated by the contractor for the Pretrial Services Office with regard to drug and alcohol abuse and as a result of his pretrial release violations, he remained in jail from approximately August 24, 1990, until October 9, 1990. Thereafter, Avila was released pursuant to a stringent order which imposed the standard order setting conditions of release in a drug case, together with the special conditions that he was to reside with his father, not leave his father's residence without permission from the pretrial services officer, be subject to electronic surveillance while in the home, have no contact with his codefendants, their spouses, or expected government witnesses, attend Alcoholics Anonymous meetings twice a week, and obtain an Alcoholics Anonymous sponsor.

Ranheim advised that the reporting requirements of the Pretrial Services Office were not onerous, that in-person reporting only required approximately ten minutes per week, and that after a certain period of time, telephone reporting was often permitted. Ranheim further testified that since Porter had failed to report and provide urine samples in the past, very specific arrangements were made to require him to do so. While those arrangements tended to interfere with Porter's employment, Ranheim saw no other alternative.

Ranheim further testified that his budget had increased dramatically. He said the Omaha, Nebraska, Pretrial Services Office was currently serving 93 people who were subject to pretrial supervision. These individuals were being supervised by Ranheim and one additional officer. Ranheim further indicated that he had recently requested a supplemental allocation from the Administrative Office of the United States Courts in order to obtain additional funds for drug treatment for pretrial services clients.

### D.

As to the impact of reprosecution, the defendants called a variety of witnesses. In addition to the testimony of Officer Ranheim described above, the defendants called the chief deputy clerk of the United States District Court for the District of Nebraska, two local attorneys, and William K. Slate, II, director of the Federal Courts Study Committee.

Gary D. McFarland (McFarland), Chief Deputy Clerk of the United States District Court, District of Nebraska, testified that he has been employed by the court for approximately 19 years. He stated that as a result of the increased criminal caseload in the United States District Court for the District of Nebraska in 1989 and 1990, the clerk of court was required to summon jurors for jury trials in both Lincoln, Nebraska, and Omaha, Nebraska, in 10 out of every 12 months (Defendants' Exhibit 33). McFarland also indicated that as a result of the increased criminal caseload the amount of monies expended under the Criminal Justice Act (CJA) in the District of Nebras-

ka had increased dramatically. I take judicial notice of the fact that in fiscal year 1988 there were approximately 130 CJA criminal appointments at the trial level in the District of Nebraska and approximately 290 CJA criminal appointments at the trial level in fiscal year 1990.

Omaha, Nebraska, attorney David Herzog (Herzog) testified. He had previously represented Koory in the state court proceeding. Herzog testified that he was admitted to practice in 1962, that he had served as a member of the house of delegates of the Nebraska State Bar Association, and that he is a member of the Federal Practice Committee of the United States District Court for the District of Nebraska. Herzog stated he is also a member of the American Trial Lawyers Association and the Nebraska Trial Lawyers Association. He is a fellow of the National College of Criminal Trial Lawyers. His practice is comprised of approximately sixty percent civil cases and forty percent criminal.

Among other things, Herzog testified that the reputation of the United States District Court for the District of Nebraska has suffered because of the "near gridlock" condition of the criminal docket. According to Herzog, this "gridlock" is causing long delays in civil litigation in federal court.

Richard Dinsmore (Dinsmore), another Omaha attorney, echoed Herzog's testimony. Dinsmore is a member of the American Trial Lawyers Association and a member and director of the Nebraska Association of Trial Attorneys. A good deal of Dinsmore's practice consists of Federal Employer Liability Act (FELA) litigation. Although Dinsmore used to file FELA suits in federal court, he stopped doing so because of the delays he perceives in federal court. As a consequence, Dinsmore prosecutes his FELA cases in state court.

William K. Slate, II (Slate), was called as an expert witness to testify in the defendants' behalf. Slate is an attorney licensed to practice in Virginia and holds an M.B.A. degree from the Wharton School. Slate is currently a visiting professor of law at the Seton Hall Law School where he addresses

his specialty of judicial administration. He has served as a court administrator in both state and federal courts. For example, Slate served as the clerk of court of the United States Court of Appeals for the Fourth Circuit and as circuit executive of the United States Court of Appeals for the Third Circuit.

Slate also served as director of the Federal Courts Study Committee, which produced the report of the Federal Courts Study Committee on April 2, 1990 (Defendants' Exhibit 27, hereinafter "the report"). The report was authored pursuant to the Federal Courts Study Act of 1988, which was a part of the Judicial Improvements and Access to Justice Act. 5 U.S.C. § 5108; 28 U.S.C. § 331 note. Among other things, the Federal Courts Study Act authorized a study to examine the problems and issues currently facing the United States courts, to develop long-range plans for the future of the federal judiciary, and to submit a report to the Judicial Conference of the United States, the President of the United States, the Congress, the Conference of Chief Justices, and the State Justice Institute concerning the revisions, if any, to the laws of the United States which the committee deemed advisable.

Slate testified that one of the main concerns of the committee, as expressed in the report, was a reallocation of business between the state and federal court systems, principally in the area of drug prosecutions. Slate called to my attention the report's findings that the "federal court's most pressing problems—today and for the immediate future—stem from unprecedented numbers of federal narcotics prosecutions" (Defendants' Exhibit 27, at 35). Accordingly, the report recommended that "[f]ederal prosecuting authorities should limit federal prosecutions to charges that cannot or should not be prosecuted in the state courts" (Defendants' Exhibit 27, at 35). According to the report, while more judges are essential, the ultimate solution is a recognition that "the new drug cases now flooding the federal system could be prosecuted just as effectively in state courts, under state laws" (Defendants' Exhibit 27, at 36).

Slate noted that the report specifically addressed concerns about the Act. Indeed, the report stated:

At some point, moreover, the federal civil docket will not be the only casualty of the war on drugs. At some point, the war on drugs will be a casualty of itself. Overload causes backlog. Backlog threatens timely prosecution and, under the Speedy Trial Act, can lead to dismissals. The Chief Justice has warned against "an hour-glass-shaped law enforcement system."

Defendants' Exhibit 27, at 36.

According to Slate, the concerns expressed in the report are apparent in the United States District Court for the District of Nebraska. To arrive at this conclusion, Slate reviewed the pleadings in this case and analyzed a document entitled, "1990 Federal Court Management Statistics," prepared by the Administrative Office of the United States Courts (Defendants' Exhibit 29).

Slate indicated that Nebraska was an extremely busy district. Slate referred to a judicial workload profile which described the United States District Court for the District of Nebraska (Defendants' Exhibit 30).

In interpreting this district's profile, it is helpful to understand that there are 96 district courts throughout the nation and 10 district courts in the Eighth Circuit. In 1990 the United States District Court for the District of Nebraska tried more cases per judge than 83 other districts, terminated more cases per judge than 75 other districts, and was confronted with more difficult cases per judge than 69 other districts.

In reference to Defendants' Exhibit 30, Slate pointed out that despite the diligence of the trial judges in the District of Nebraska the median time from filing to disposition of criminal felony cases in this district rose from 3.5 months to 6.7 months between 1985 and 1990. This ranks the United States District Court for the District of Nebraska 82nd out of 96 districts in the United States and 9th out of 10 dis-

tricts in the Eighth Circuit. Furthermore, it appears that the number of triable defendants in pending criminal cases in this district rose from 27 in 1985 to 159 in 1990.

However, Slate acknowledged that the time from filing to disposition and from issue to trial for civil cases in this district had remained about the same from 1985 through 1990. Slate also stated that the district had relatively few civil cases over three years old. The United States District Court for the District of Nebraska ranks 14th nationally and 2nd in the Eighth Circuit for the fewest cases over three years old.

Slate was of the opinion that the impact of reprosecution of these cases on the Act would be adverse, particularly since there was a discretionary outlet for the reprosecution of these cases in state court. Slate was also of the opinion that reprosecution of these cases in federal court would negatively impact the administration of justice.

I take judicial notice of the fact that with regard to the Omaha docket there has been no pattern or practice of violations of the Act, in terms of the 70–days–to–trial provisions, by the Office of the United States Attorney for the District of Nebraska during my term as a United States Magistrate Judge in Omaha, Nebraska. Since February 2, 1987, the date of my appointment, I am aware of only one postindictment violation of the Act in terms of the 70–days–to–trial provisions.[2] *See United States v. Jennings*, CR 89–0–52, (D.Neb. Mar. 13, 1990) (order of Judge Cambridge adopting magis-

trate's findings and recommendations recommending dismissal without prejudice).

The *Jennings* case involved a two-count indictment alleging unlawful distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and use of a weapon during the commission of a drug crime in violation of 18 U.S.C. § 924(c). In that case, at the time of the filing of the motion to dismiss, the speedy trial clock had run against the government in that 74 days had elapsed in violation of the 70–days–to–trial provisions of 18 U.S.C. § 3161(c)(1). The *Jennings* case, like this case, involved a situation where pending state charges were dropped and federal charges were initiated soon thereafter. The *Jennings* case involved an assistant United States Attorney, other than Donald Schense, who was a regular assistant, rather than a special assistant like Schense. In the *Jennings* case I explicitly recommended that no sanctions be imposed against the assistant United States Attorney involved or against the Office of the United States Attorney for the District of Nebraska, finding that both the assistant and the United States Attorney's Office generally were "capable, conscientious, and straightforward." *United States v. Jennings*, CR 89–0–52, slip op. at 13 n. 2 (Magistrate's Findings and Recommendations). *Jennings* involved a situation where the prosecutor was in trial on another case when the Act ran, and he had expected the *Jennings* defendants to plead.

## II. LAW

The Act requires that in determining whether to dismiss with or without preju-

---

**2.** In noting that *Jennings* is the only case concerning a 70–days–to–trial violation of the Act involving the Omaha, Nebraska, docket of this court with which I am familiar, I do not mean to suggest that there have not been other "Speedy Trial" dismissals. For example, in *United States v. Iwuamadi*, 716 F.Supp. 420 (D.Neb.1989), *aff'd*, 909 F.2d 509 (8th Cir.1990), I recommended dismissal without prejudice, and Judge Cambridge adopted my recommendations, regarding a violation of the Interstate Agreement on Detainers, 18 U.S.C.App. § 2 (1970) and 18 U.S.C.A.App. § 9 (Supp.1989). However, cases such as *Iwuamadi* have only tangential relevance to the issues before this court under the Act. For example, one of the issues before the court in *Iwuamadi* was the interplay between detainers, writs of habeas

corpus ad prosequendum, and the impact of a dismissal without prejudice on the status of a prisoner in state custody who had previously been subject to a federal detainer. *Id.* at 426–427. *See also United States v. Adeogba*, CR 86–0–49 (D.Neb. Nov. 6, 1987). In *Adeogba* Judge Strom dismissed a theft case with prejudice for violation of the defendant's Sixth Amendment rights. *Id.*, slip op at 5–9. In that case the government knew the defendant was in a federal prison on unrelated charges, but failed to file a detainer or seek the defendant's presence in this district, as required by 18 U.S.C. § 3161(j)(1), for approximately eight months after indictment. *Id.*, slip op. at 2–3. Despite the violation of 18 U.S.C. § 3161(j)(1), the dismissal was on Sixth Amendment grounds.

dice the court must "consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances ... which led to the dismissal; and the impact of reprosecution on the administration of [the Act and] of justice." 18 U.S.C. § 3162(a)(2).

■■■ The Supreme Court has made it clear that the Act does not prefer one remedy over the other in terms of dismissal with or without prejudice. *United States v. Taylor*, 487 U.S. 326, 332–35, 108 S.Ct. 2413, 2417–19, 101 L.Ed.2d 297 (1988). The Court made it clear that a district court, while vested with considerable discretion, must carefully consider the specified factors as applied to a particular case and articulate clearly the effect of those factors on the district court's decision-making process. *Id.* at 335–37, 108 S.Ct. at 2419–20. The Court further made clear that a district court's desire to send a strong message to the government that unexcused delays will not be tolerated is not, standing alone, sufficient reason to bar reprosecution in light of all other circumstances. *Id.* at 337–43, 108 S.Ct. at 2420–23. Thus, in a drug case involving a 15–day violation of the Act, the Court concluded that the district court had abused its discretion under the Act when the district court failed to explicitly consider all of the factors relevant to the choice of remedy under the Act. *Id.* at 344, 108 S.Ct. at 2423.

It is rare to find a circuit court opinion upholding a dismissal with prejudice for violation of the Act in a federal drug prosecution.[3] I found only three published opinions of the circuit courts ordering dismissal with prejudice for violation of the Act in drug cases, and these cases represented, in the view of those circuit courts, egregious violations of the Act. *United States v.*

*Giambrone*, 920 F.2d 176 (2nd Cir.1990) (although the violation was only 20 days, the case presented a pattern of neglect, evidenced in other cases, representative of a "cavalier" attitude of the local prosecutor regarding the Act); *United States v. Stayton*, 791 F.2d 17 (2nd Cir.1986) (dismissal with prejudice warranted where violation of the Act was nearly two years); *United States v. Russo*, 741 F.2d 1264 (11th Cir. 1984) (dismissal with prejudice was justified where violation was at least several months and perhaps as much as nearly five months, where the only excuse offered was the government's "plain ignorance").

In most drug cases dismissal without prejudice is the rule. Indeed, *Taylor* was a drug case where the court assumed a violation of 15 days. 487 U.S. at 332 n. 6, 108 S.Ct. at 2417 n. 6. Even where the violation of the Act involves months, dismissal without prejudice is the remedy most often selected for drug cases. *See, e.g., United States v. Arango*, 879 F.2d 1501 (7th Cir. 1989), *cert. denied*, 493 U.S. 1069, 110 S.Ct. 1111, 107 L.Ed.2d 1019 (1990) (dismissal without prejudice involving a violation of three months); *United States v. Simmons*, 786 F.2d 479 (2nd Cir.1986) (dismissal without prejudice involving a violation of up to four months); *United States v. Brown*, 770 F.2d 241 (1st Cir.1985), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 816, 88 L.Ed.2d 789 (1986) (dismissal without prejudice involving a violation of 35 days).

■■■ With the these considerations in mind, I turn now to the three analytical factors which must be considered. As indicated, the first factor is the seriousness of the offense. The second factor involves the facts and circumstances leading to dismissal. The third factor is the impact of reprosecution on the administration of the Act and on the administration of justice.

**3.** I have been able to find only one case decided by the United States Court of Appeals for the Eighth Circuit which discusses at any length whether dismissal should occur with or without prejudice for a postindictment violation of the Act, *United States v. Kramer*, 827 F.2d 1174 (8th Cir.1987). That case involved a 112–day period of nonexcludable time which resulted in a 42–day violation of the Act. The defendant in

*Kramer* was indicted for misapplication of bank funds and false entries in bank records. The court of appeals held that the seriousness of the offenses and the facts and circumstances of the case did not favor dismissal with prejudice, particularly because a 46–day postponement of trial resulted from the district judge wrongly assuming the unavailability of a trial judge to handle the case.

## A.

All of the defendants stipulate that the offenses charged are serious ones. Indeed, in the Nejdl case the possible sentence for each count appears to be a term of imprisonment of not more than 10 years, a fine not to exceed $500,000 and a term of supervised release of at least four years, as provided for in 21 U.S.C. § 841(b)(1)(D) and as doubled by the provisions of 21 U.S.C. § 845a.

Because it is the defendant's second federal offense involving drugs, the prescribed punishment for count I of the indictment in the Koory case appears to be a term of imprisonment of not more than 60 years, a fine of not more than $4,000,000, and a 12-year term of supervised release, as provided for in 21 U.S.C. § 841(b)(1)(C) and doubled by the provisions of 21 U.S.C. § 845a. For the offenses charged in count II of the indictment, the minimum punishment appears to be a term of imprisonment of five years, to run consecutively to the term of imprisonment prescribed in count I, as provided for in 18 U.S.C. § 924(c)(1). Moreover, the government contends this is Koory's second offense involving the use of a gun in a drug-trafficking crime which, if true, would mean the penalty is a minimum of 20 years in prison, to run consecutively to the sentence imposed under count I. Id. There can be no doubt, therefore, that both cases involve very serious offenses.

I also note that each of these cases is a so-called "school zone" case. The "schoolhouse" statute enhances the penalty otherwise imposed with regard to the sale of drugs, reflecting "Congress's interest in shielding ... children from the evils of the drug trade." *United States v. Nieves,* 608 F.Supp. 1147, 1149 (S.D.N.Y.1985). The fact that each of the defendants is charged with "school zone" violations makes these offenses "doubly" serious, at least if one looks at the penalty enhancement provision of 21 U.S.C. § 845a(a), now codified at 21 U.S.C. § 860.[4]

## B.

In both of these cases Schense appeared as a special assistant United States Attorney. At the time these cases were filed, and during the pendency of their prosecution, Schense was not a regular employee of the Office of the United States Attorney for the District of Nebraska. Rather, he was specially deputized to handle the prosecution of "school zone" cases which originated from state investigations. Quite clearly, Schense was unfamiliar with the provisions of the Act (Plaintiff's Exhibit 105, Stipulation of the Parties Regarding the Testimony of Schense).

There is no evidence in the record to suggest that Schense's actions were intentional in the sense of deliberately violating the Act. There is also no evidence in the record to suggest that Schense intended his actions to obtain some tactical advantage for the government, such as "wearing out" the defendants or the like.

As a mitigating circumstance, I note the following. In both of these cases the court did not rule upon a report and recommendation issued on dispositive motions within the 30-day excludable time period provided in 18 U.S.C. § 3161(h)(1)(J). 18 U.S.C. § 3161(h)(1)(J) provides that any delay which is reasonably attributable to any period, not to exceed 30 days, during which any proceeding concerning the defendant is actually under advisement by the court shall be deemed excludable time under the Act.

In the Nejdl case the magistrate's report and recommendation regarding motions to suppress was filed July 13, 1990 (Filing 54), but not ruled upon until November 5, 1990 (Filing 74). In the Koory case the magistrate's report and recommendation regarding motions to suppress was filed August

---

4. I recognize that the government does not contend that any of the defendants sold drugs to children or that any of the sales took place on the premises of a school. However, this does not detract from the seriousness of the offense since the essential purpose of the "schoolhouse" statute was to implement Congress's intention to keep the source of addiction out of easy reach of school-age children. *Nieves,* 608 F.Supp. at 1149 & n. 4 (citing 130 Cong.Rec. S559 (daily ed. Jan. 31, 1984) (remarks of Sen. Hawkins)).

15, 1990 (Filing 26), but not ruled upon until October 15, 1990 (Filing 28).

Thus, if the time when the Nejdl motions were under submission were to be considered excludable time, the violation of the Act would only be about 1 day. (The calculation of includable time would be as follows if the entire time under submission was excludable: the time between May 7, 1990, and May 17, 1990 (11 days) would have been includable, the time between November 5, 1990, and December 31, 1990 (57 days) would have been includable, and the time between January 1, 1991, and January 3, 1991 (3 days) would have been includable; a total of 71 days). Likewise, in the Koory case the violation of the Act would be substantially reduced if the time that the motions to suppress were under advisement was entirely excludable. Instead of 30 days being excludable, 60 days would have been excludable, thereby reducing the violation of the Act from 59 days to 29 days.

In this connection I note that under the Nebraska equivalent of the Act any period of delay involving "the time from filing until final disposition of pretrial motions of the defendant, including motions to suppress evidence" is excluded in computing the 6–month Nebraska speedy trial statutory requirement. Neb.Rev.Stat. § 29–1207 (Reissue 1985). Under Nebraska law it appears that the entire time a motion is under submission is excludable, not merely 30 days. *State v. Brown,* 214 Neb. 665, 335 N.W.2d 542 (1983) (holding, among other things, that there should be excluded from computing the time for trial a period from the filing of a motion on September 18 until final disposition of the motion by the trial court on its own motion on December 28; that is, 102 days). Thus, there is at least a plausible reason to believe that Schense was confused [5] by the differences between the Act and the Nebraska analogue to the Act. On the one hand, under the provisions of the Act, which governs in federal court, only 30 days were excluda-

ble, whereas the entire time would have been excludable under the Nebraska analogue to the Act.

■ In summary, it appears that the failure to comply with the Act resulted in large part from a lack of familiarity with the terms of the Act on the part of the special assistant United States Attorney charged with prosecuting these cases, and not purposeful misconduct or a recurrent pattern of ignoring the Act. Accordingly, I conclude that this "[r]andom negligence, while not to be condoned, is less blameworthy than purposeful misconduct or recurrent transgressions, and weighs less heavily in favor of banning reprosecution." *United States v. Hastings,* 847 F.2d 920, 925 (1st Cir.1988).

### C.

With regard to the third analytical factor, the defendants assert two reasons for concluding that dismissal with prejudice should occur. First, the defendants argue that these cases should have been prosecuted in state court to begin with and that they can still be prosecuted in state court even if they are dismissed with prejudice. Consequently, the court ought to dismiss these cases to further the administration of the Act and the administration of justice generally. Second, the defendants argue that they have suffered prejudice of a kind and severity which warrants dismissal with prejudice in order to further the goals of the Act and the administration of justice generally. I shall consider these arguments in turn. I shall then independently consider the impact of reprosecution on the Act, and upon the administration of justice in general.

### 1.

The argument that these cases should have been prosecuted in state court in the first place, thereby justifying dismissal with prejudice, is appealing. There are all sorts of good policy reasons that might be

---

**5.** Misunderstanding the plain words of the Act would not be a mitigating factor for a regular assistant United States Attorney who would fairly be charged with understanding the plain lan-

guage of the Act. *Russo,* 741 F.2d at 1267. In this circumstance Schense had no day-to-day familiarity with Act, but rather had day-to-day experience with the Nebraska analogue.

advanced to suggest that criminal cases which can be prosecuted in state court ought to be. Indeed, the report of the Federal Courts Study Committee sets forth those arguments in great detail. Mr. Slate, executive director of the Federal Courts Study Committee, persuasively described the many policy reasons why one can convincingly argue that prosecutions which lack interstate or foreign elements should be prosecuted in state court.

However, if I were to adopt the arguments of the defendants, and Slate, that these cases ought to be dismissed with prejudice because they could be and ought to be prosecuted in state court, I would essentially be adopting a categorical policy of preferring dismissal with prejudice in certain drug cases as opposed to dismissal without prejudice. In my judgment the Supreme Court made it clear in *Taylor* that such categorical approaches disregard the case-by-case balancing approach required by the Act. 487 U.S. at 343 & n. 15, 108 S.Ct. at 2423 & n. 15.

Moreover, if the defendants' contention were adopted, this court would be put squarely in the position of judging the decision of the executive branch to institute prosecutions and the policy reasons underlying that decision. In other words, the defendants want this court to judge the validity of the prosecution decision in these cases, notwithstanding the fact that Congress has authorized the executive branch to prosecute just such cases as these in federal court. It is one thing for a federal court study committee to question the wisdom of prosecuting cases such as these in federal court, and an entirely different matter for a court to comment upon the validity of the policy decision of the executive branch to prosecute a particular case in federal court. Bluntly stated, this court has no business directly or indirectly judging whether prosecutions such as these ought to be commenced or maintained in federal court as opposed to state court. *See, e.g., United States v. Brown*, 481 F.2d

1035, 1042–43 (8th Cir.1973) (absent some compelling need for, or explicit exception allowing, judicial intervention, the broad power of the executive branch to prosecute offenses against the United States should not be disturbed).

I pause for a moment to consider a portion of the defendants' argument that since these cases could be reprosecuted in state court a dismissal with prejudice insofar as federal prosecution is concerned is less onerous, particularly since these cases should have been prosecuted in state court in the first place. I assume for the moment that the predicate of the defendants' argument is correct, that is, that state prosecution would not be barred by dismissal with prejudice regarding federal prosecution.[6] The defendants' arguments in this regard assume a number of things.

The defendants assume there is "unused" capacity in state court to handle these cases. In other words, the arguments of the defendants assume there is unused judicial capacity in state courts to absorb the prosecution of these cases. There is no reason from this record to assume that the state courts are any better able to expeditiously· handle these cases than this court. Indeed, the Federal Courts Study Committee recommends that some of the funds Congress "has approved for drug enforcement should be used to provide assistance for drug enforcement at the critical state and local level, including resources for state courts, public defenders and assigned counsel" (Defendants' Exhibit 27, at 37–38). This would seem to suggest that the problem of capacity is not solely limited to the federal courts.

Also, it cannot be assumed that prosecution of these cases in state court would further the interests which Congress sought to advance when it enacted the "schoolhouse" statute. It is plain that Congress perceived that the sale and distribution of drugs within an area proximate to a school was a matter of national, not

---

**6.** Although the defendants, through their counsel, conceded the point during argument of this case, I pressed their counsel for a stipulation that would be binding upon the defendants if

these cases were reprosecuted in state court. For a variety of reasons, defense counsel were unwilling to so stipulate.

merely local, concern. There is no evidence in the record that a state prosecution would have the desired effect of "doubling" any penalty which might otherwise be applied for an intended sale of drugs in an area within 1,000 feet of a school.

The contention of the defendants and Slate that prosecution and reprosecution of these cases in state court will further the legitimate ends which Congress sought to protect by enacting the "schoolhouse" statute incorrectly assumes that there was in existence at the time these offenses were committed a state law which paralleled the federal "schoolhouse" law. The defendants have not argued that there is a state "schoolhouse" statute which would be applicable to their conduct, and I have been unable to find any state corollary to the federal "schoolhouse" statute. There is no assurance, therefore, that a state prosecution would further the interests sought to be protected by the federal "schoolhouse" statute.

■ In summary, the fact, if it is one, that these cases could have been brought in state court, and might be brought in state court once again if the federal cases were dismissed with prejudice, is not a good reason to dismiss these cases with prejudice. First, this court ought not to presume to judge the validity of the executive branch's decision to prosecute federal cases, as opposed to allowing them to be prosecuted in state court, when Congress has provided federal jurisdiction. Second, assuming that

there is unused judicial capacity in state court, a doubtful proposition at best, there is no evidence that a state prosecution would further the same interests that Congress sought to protect by enactment of the "schoolhouse" statute. As a consequence, I do not accord special significance to the possibility that these cases could be reprosecuted in state court if this court were to dismiss the pending federal charges with prejudice.[7]

### 2.

I turn next to the issue of prejudice. The defendants do not claim the government obtained any tactical advantage by virtue of the delay. The defendants also do not claim that the defense of their cases was prejudiced in the sense that evidence has been lost. Rather, the defendants claim more generalized prejudice having to do with the anxiety suffered by the defendants and their families, disruption of employment, the drain on their financial resources, and the like.

■ I recognize that the defendants are not obligated to show prejudice. *Kramer*, 827 F.2d at 1178. A showing of prejudice may, however, be considered in determining whether dismissal should be with or without prejudice. *Id.* Likewise, "the failure of the defendant to show any prejudice other than that occasioned by the original filing is a circumstance that should be considered in determining the type of dismissal warranted." *Id.* (citation omitted).

---

7. In so finding, I do not mean to suggest that the report of the Federal Courts Study Committee is wrong, nor do I mean to suggest that the report of the Federal Courts Study Committee is correct. I do mean to suggest that it is what it purports to be, that is, a report commissioned by Congress, nothing more and nothing less. Certainly the report ought not to be used to dictate whether or not a particular case should be dismissed with or without prejudice for violation of the Act. The Act, and the precedents, are what must control. Moreover, I certainly do not mean to deny the significance of the impact on this court's caseload of drug cases generally, and school zone cases in particular. As the defendants point out, the United States Attorney for this district is evidently aware of, and apparently sensitive to, the limited resources of this court (Defendants' Exhibit 31). In any event, no matter how onerous the court's

burden, it is Congress, and not this or any other federal court, which has the right under the Constitution to define the federal criminal law. In so doing, Congress in the first instance has the right and obligation to determine whether or not the use of the judiciary's resources is appropriate or not in a given class of cases. The executive branch in the second instance has the constitutional right and obligation to determine whether or not the judiciary's resources will be wisely used by the prosecution authorized by Congress. In my judgment the court's role in a specific case is a passive one, except to the extent of the court's obligation to review questions of subject matter jurisdiction. Provided the court has jurisdiction, whether prosecution regarding a particular class of cases is a wise use of the scarce federal judicial resources is a question of policy which is not left to the court for decision in a specific case.

With regard to the issue of anxiety, I note that each of the defendants was released pursuant to an order setting conditions of release. Koory was detained in federal custody for only a few days, and he was then released pursuant to an order setting conditions of release. Avila remained in custody for a significant period of time due to his use of drugs and alcohol, but he was subsequently treated and released pursuant to an order setting conditions of release.[8]

For most of the time between the date the federal indictment was filed and consideration of these motions, the defendants have been released. In many respects they have been able to go about their daily lives. However, I recognize, as did Chief Judge Lay in his dissent in *Kramer*, 827 F.2d at 1180, that it is nevertheless difficult to live with anxiety of a pending criminal matter, and one of the purposes of the Act was to relieve that anxiety to the extent possible by a prompt trial. Thus, I do find that the defendants suffered some prejudice by virtue of anxiety as a result of the delay in these cases, although such prejudice is extremely difficult to quantify.

I was particularly unimpressed with the testimony of the psychiatric social worker, Ms. Hacker, in these cases. None of the defendants interviewed by Ms. Hacker (and her interviews were for purposes of these motions, as opposed to treatment) displayed any clinical signs of emotional or mental illness, with the exception of stress, proximately caused by these prosecutions. Koory seemed to be getting along fine. Avila was diagnosed as having a sociopathic personality. While Porter was anxious, there was no indication that his anxiety was a product of the delay of his case so much as it was a product of the prosecution itself.

Porter is evidently dependent upon alcohol, and Avila is evidently dependent upon alcohol and controlled substances. However, the dependencies of these two defendants are not proximately caused by delay of their cases.

Thus, while I do not doubt that each defendant has suffered some stress or anxiety as a result of the delay, it is impossible to conclude that such stress or anxiety is different in kind or greater in degree than that stress or anxiety which would be occasioned by the filing of the charges in the first place. To the extent that it is relevant, the same can be said for the anxiety, real as it might be, suffered by the families of the defendants.

The defendants also claim prejudice by virtue of the fact that some of them posted bonds in state court and when those bonds were exonerated at the time the state cases were dismissed, the defendants lost a portion of their bond as a fee to the state court. Thus, the defendants claim that these federal prosecutions have unnecessarily cost them financial resources. Be that as it may, such cost is not fairly attributable to any delay in the federal prosecutions. Accordingly, this type of harm is not relevant to whether these cases should be dismissed with or without prejudice.

Some of the defendants contend that delay of their cases has caused them to suffer, and to continue to suffer, economically in other ways. For example, defendants Nejdl and Koory, who are represented by attorney James Martin Davis, point out that their retainer agreement with Davis will be satisfied if these cases are dismissed. In order to rehire Davis if their cases are reprosecuted, they will have to expend additional funds. Defendant Avila also suggests, at least indirectly, that he may be unable to employ his present retained counsel if a new criminal prosecution is commenced. Furthermore, all defendants claim the delay has impacted their work or business. For example, Emery stated that the delay has caused him to lose money he could have earned had he been able to go to work instead of appearing in court for hearings on various motions. Porter claims he has been unable to take a

---

**8.** Parenthetically, I note that I was advised on May 7, 1991, that a urine specimen provided by Avila was returned as positive for cocaine.

union job because of the pendency of these proceedings, while Koory claims he has had to take time away from his sole proprietorship in order to report on a weekly basis as directed by the United States pretrial services officer.

These issues of economic prejudice, while not unimportant in the abstract, are also not significant as a practical matter. Should the defendants require counsel, the court has the authority to appoint counsel under the Criminal Justice Act and to pay for the services of counsel so as to ensure that the defendants have adequate and competent representation.[9] In addition, while I do not doubt that there has been some economic cost to the defendants by virtue of the delay in these cases, that economic cost has been relatively minimal. More to the point, it is virtually impossible to isolate additional economic costs to the defendants as a proximate result of the delay, as opposed to the economic costs "occasioned by the original filing." *Kramer*, 827 F.2d at 1178.

Defendant Avila's circumstances are somewhat unusual and merit brief comment. Unrelated to the incidents at issue, Avila was involved in an automobile accident and lost his leg. There is some suggestion in the evidence that he has postponed surgery and occupational rehabilitation during the pendency of these proceedings. It is at least suggested in the record that the delay of Avila's surgery and occupational rehabilitation was occasioned by the delay in these proceedings. I do not believe this testimony. Except for the time when Avila's order setting conditions of release was revoked for drug and alcohol abuse, he could have sought and obtained whatever treatment was required. If Avila had firm plans to seek such treatment, those plans were certainly not communicated to the United States pretrial services officer, nor were they communicated to the court in the form of a motion so that the court could make the necessary arrangements to accommodate Avila's rehabilitative needs. The evidence does not establish that the delay in the prosecution of these cases significantly contributed to the delay in Avila's rehabilitation.

Summarizing the issue of prejudice, I do not doubt that the defendants have suffered some anxiety as a result of the delay of these cases, nor do I doubt that they have suffered some economic consequences as result of the delay. However, these items of prejudice are impossible to quantify with any degree of specificity and it is difficult, if not impossible, to determine whether these items of prejudice were caused by the delay or resulted from the original filing.

### 3.

Finally, I turn to the impact of reprosecution on the administration of the Act and on the administration of justice generally.

There is no doubt that this court has a responsibility to see to it that the Act is complied with. However, it is not clear precisely what role the court should play in supervising day-to-day compliance with the Act. *See* A. Partridge, *Legislative History of Title I of the Speedy Trial Act of 1974* (Federal Judicial Center, August, 1980). In other words, is the court obligated to actively look over the shoulder of each prosecutor to ensure that each case is not dismissed as a result of a violation of the Act? I do not believe so.

The Speedy Trial Plan of the United States District Court for the District of Nebraska, approved June 13, 1978, and amended July 9, 1980, specifically requires that the "United States Attorney will familiarize himself with the scheduling procedures of each judge and will assign or reassign cases in such manner that the government will be ready for trial consistent with the provisions of the Speedy Trial Act of 1974." Speedy Trial Plan of the

---

**9.** I note, but do not decide, that James Martin Davis, as well as any other counsel presently retained by the defendants, may have an ethical obligation to accept a criminal appointment from this court if these cases were reprosecuted. In fact, it is my intention to appoint retained counsel in these cases, pursuant to the Criminal Justice Act, if these cases are reprosecuted and these defendants represent to the court that they are no longer able to afford the services of retained counsel.

United States District Court for the District of Nebraska, ¶ II, 4b (as amended July 9, 1980).

In endeavoring to ensure compliance with the Act, the court has implemented, among other things, the following procedures in dealing with the criminal docket in Omaha, Nebraska. As required by the Speedy Trial Plan of the United States District Court for the District of Nebraska, cases are normally set for trial no later than 60 days from the date of arraignment, and, most often, within 45 days from the date of arraignment. In each case the time for compliance with the reciprocal discovery provisions of Federal Rule of Criminal Procedure 16 is set (normally 10 days from the date of arraignment), and a motion date is set (normally 20 days from the date of arraignment).

These dates (trial date, Rule 16 date, and motion date) are seldom, if ever, changed without a motion from either the government or the defendant. If such a motion is filed, the motion is normally presented to the United States magistrate judge the day after its filing for review and analysis. At that time a specific determination is made as to whether or not the motion should be granted and, if so, whether the extra time will be excludable time under the provisions of the Act. If the time is to be deemed excludable, the magistrate judge will make the appropriate finding in writing, as required by the Act. 18 U.S.C. § 3161(h)(8)(A) & (B). Indeed, every motion filed in a criminal case is reviewed within a day or so after its filing by the magistrate judge handling the Omaha, Nebraska, docket and the magistrate judge will then either resolve the motion or route the motion for resolution by the appropriate Article III judge, pursuant to the general operating procedures of the court.

Since April, 1990, the court has implemented a computerized speedy trial accounting system to assist the court in endeavoring to plan its trial docket. The results of this accounting system are available to the prosecution and the defense from the Clerk's office. Moreover, it is the practice of both Article III judges in Omaha, Nebraska, to consult with the United States Attorney's Office each month to determine whether or not there are cases which require trial that month under the provisions of the Act. In addition, the Article III judges in Omaha, Nebraska, and the United States magistrate judge in Omaha, Nebraska, recently requested, and now receive every two weeks, a report from the United States Attorney which describes each case by number and by defendant, and states the date the speedy trial clock started, the days used, the status of the case, an indication of whether or not a plea is probable, and a statement as to when jury selection is required.

It appears, therefore, that the court is doing everything it can reasonably be expected to do to monitor and ensure compliance with the Act. In the last analysis, I agree with Chief Judge Lay that it is "the burden of the government to protect its own record and to assure that the defendant's speedy trial rights [are] not violated." *Kramer*, 827 F.2d at 1180–81 (Chief Judge Lay, dissenting) (citations omitted). It is not for the judges of "this court to serve as guardian angels to prevent the government from committing error prejudicial to itself." *Id.* at 1181. To the credit of the United States Attorney for the District of Nebraska, neither he nor his assistants have taken the position that this court somehow bears a responsibility to protect the government's case from dismissal under the Act. I also do not understand the defendants to contend that this court has neglected its duty, as a general matter, under the Act.

I do understand the defendants to contend that, based upon Mr. Slate's testimony, this court is becoming increasingly slower in the resolution of criminal cases in the district, and this slowness is also affecting the civil docket. In this regard the defendants contend that the court's reputation is being harmed by what one of the attorneys who testified described as "gridlock" resulting from the numerous criminal cases on the docket. From these facts the defendants argue that reprosecution will adversely affect the administration of the

Act and the administration of justice generally.

Both of the local attorneys the defendants called to testify stated that their primary civil practice in federal court involved FELA cases. These witnesses testified that their FELA cases were being delayed by the backlog of criminal cases. Ironically, the report of the Federal Courts Study Committee strongly recommended eliminating the Federal Employer Liability Act altogether (Defendants' Exhibit 27, at 62).

More to the point, the statistics upon which the defendants rely to show a harmful impact on civil cases as a result of the criminal caseload are not compelling. For example, between 1985 and 1990, when the number of triable defendants in pending criminal cases rose from 27 to 159, the time from issue to trial in civil cases remained the same at 16 months. The time from filing to disposition of civil cases rose minimally, from 9 months to 11 months. Moreover, the increase in the number of civil cases pending for more than three years, up from 1.3 percent to 2.7 percent over the five-year period, is not alarming. Indeed, the District of Nebraska stood 2nd in the Eighth Circuit and 14th in the nation in terms of the least number of civil cases over three years old. Accordingly, from the evidence presented to me I cannot conclude that reprosecution of these two criminal cases would have a significant impact upon the administration of justice insofar as this court's civil docket is concerned.

Regarding the criminal docket of this court, insofar as the administration of the Act and the administration of justice generally is concerned, there is no doubt that reprosecution of these two criminal cases will have an adverse impact to some degree. Clearly, this court's criminal docket has expanded significantly. One need only recognize that in 1985 there were 27 triable defendants in pending criminal cases and that by 1990 that number had risen to 159. In raw numbers, criminal felony filings rose from 31 to 59 during that same time period. This has increased the length of time from the filing of a criminal case to its disposition from an average of 3.5 months in 1985 to an average of 6.7 months in 1990. This district's time from filing to disposition ranks near the bottom of the Eighth Circuit and near the bottom nationwide. This is true notwithstanding the fact that this court ranks near the top of the district courts in the both the circuit and the nation in terms of the total number of cases handled per judge, terminated per judge, and tried per judge, particularly considering the difficulty of the cases confronting the judges as evidenced by the weighted-filing statistics.[10] Thus, the time required to reprosecute these two cases would simply add to the court's already crowded criminal agenda. This court has very little capacity to handle the same criminal case twice.

While it is obvious that handling a criminal case twice in this district is adverse to the administration of the Act and the administration of justice generally because the court has so little excess capacity for trying criminal cases, it is nevertheless difficult to assess the severity of the adverse impact. If these cases are reprosecuted in federal court, they will require three trials

---

10. Using the 1990 statistics, it is interesting to compare the situation in this district with the United States District Court for the Middle District of Florida, where that court recently suspended the trial of all civil cases in order to try only criminal cases. In the Middle District of Florida, where the court has nine judgeships, compared with three judgeships in Nebraska, the total number of pending cases per judge is about the same (540 in Florida and 552 in Nebraska) (Defendants' Exhibit 29 at 118 & 161). The weighted filings were about the same (Florida ranked 16th in the nation and 2nd in its circuit, and Nebraska ranked 27th in the nation and 2nd in its circuit). In trials per judge Nebraska tried a good many more cases than Florida (41 in Florida and 51 in Nebraska). In number of civil cases over three years old, Nebraska did quite a bit better than Florida (6.0% in Florida compared to 2.7% in Nebraska). The time from filing to disposition and from issue to trial in civil cases was about the same (10 and 13 in Florida compared to 11 and 16 in Nebraska). Florida disposed of criminal cases at a slightly faster rate (5.9 months in Florida compared to 6.7 months in Nebraska). The number of triable defendants per judgeship was about the same (50 in Florida (446 divided by 9) compared to 53 in Nebraska (159 divided by 3).

since count I has been severed from count II in the Nejdl case. However, since these cases have not been tried before, there are no "sunk costs" in terms of retrial. The cases would have to be tried in any event. Whatever motion practice might be expected to occur as a result of the refiling of these cases has already occurred. Motions to suppress, motions for severance, and motions for bills of particulars have already been dealt with. Thus, most of the motion practice which has taken place can be duplicated with relative ease. Certainly there will be time wasted on the general administration of these cases in terms of the impact upon the Clerk's Office, the Pretrial Services Office, and the like. All in all, however, the degree of the adverse impact is not likely to be terribly significant.[11]

Further, the drug cases at the circuit level upon which the defendants rely for dismissal with prejudice are those cases in which the local office of the United States Attorney has acted in a cavalier fashion toward speedy trial rights. *See, e.g., Giambrone,* 920 F.2d 176. In this case, there is no reason to believe that the United States Attorney for the District of Nebraska has a cavalier attitude toward the Act, and there is certainly no showing of any pattern of neglect. As a consequence, there is no compelling reason to use the coercive authority of dismissal with prejudice to bring the prosecutor into line.[12]

### III. CONCLUSION

The appropriate resolution of these cases is not free from doubt. On the one hand, the delay in these cases was significant. It was not a delay of a few days, but a few months. However, the significance of this delay is reduced, in part, because of the prosecutor's evident misunderstanding, as a result of his experiences in state court, of "excludable time" when a motion is under submission to a district judge in federal court. The prosecutor neither sought nor obtained any tactical advantage in these cases. Furthermore, there is no doubt that the defendants suffered some prejudice, although the exact nature of that prejudice is difficult to quantify. This prejudice is even more difficult to attribute to the delay as opposed to being the natural consequence of the original filing. Further, the administration of the Act and justice in general will be adversely impacted, at least to the extent required to handle these criminal cases twice. The impact on the court's criminal docket, however, is not expected to be great. Aside from the "cost" of trying these cases, which the court would have had to do in any event, there is very little unrecoverable "sunk costs" because most of the motion practice has already been completed. Moreover, from the record before me, there is simply insufficient reason to conclude that reprosecution of these cases will adversely impact this court's civil docket. These are very serious cases involving drugs. Still further, there is no pattern of abuse by the local United States Attorney with regard to the Act and, thus, no reason to send a "message."

On balance, therefore, I conclude, and will recommend, that these cases should be dismissed, without prejudice to reprosecution. Accordingly,

IT IS RECOMMENDED to the Honorable Lyle E. Strom, Chief United States District Judge, District of Nebraska, that the

---

**11.** For the same reason that the defendants suggest these cases should be tried in state court—they are not sophisticated drug cases having interstate or foreign elements—these cases are relatively easy to try in this court.

**12.** While dismissal with prejudice serves an educational function, so does dismissal without prejudice. As Justice Blackmun pointed out in *Taylor,* 487 U.S. at 342, 108 S.Ct. at 2422, dismissal without prejudice "is not a toothless sanction" because it forces the government to obtain a new indictment if it decides to reprosecute, and it exposes the prosecution to dismissal on statute-of-limitations grounds. Moreover, the necessity of having to "do it twice," together with a substantial delay, "may make prosecution, even if permitted, unlikely." *Id.* In addition, the Act also permits a district court to punish dilatory counsel, including a prosecutor. 18 U.S.C. § 3162(b). To the extent that the court needs to send a "message", the liberal use of sanctions can serve that end. *Id.* at 342 n. 14, 108 S.Ct. at 2422 n. 14. In this case I find that sanctions against the prosecutor are both unwarranted and unnecessary.

Nejdl case, CR 90–0–42, be dismissed without prejudice, and that the defendants' motions (Filings 75, 76, 77, and 78) be granted in part, and denied in part, accordingly.

IT IS RECOMMENDED to the Honorable William G. Cambridge, United States District Judge, District of Nebraska, that the Koory case, CR 90–0–40, be dismissed without prejudice, and that the defendant's motion (Filing 29) be granted in part, and denied in part, accordingly.

IT IS RECOMMENDED to both Chief Judge Strom and Judge Cambridge that in the interests of justice the time in excess of 30 days when these motions were under submission should be deemed excludable time pursuant to the provisions of 18 U.S.C. § 3161(h)(8)(A) & (B) for the reason that although the time expended by the magistrate judge (from April 4, 1991, to the date of these reports and recommendations) exceeded 30 days, the ends of justice were served by taking such time and outweigh the best interests of the public and the defendants in a speedy trial because analysis of the evidentiary hearing record, comprising four days of testimony, confronted the magistrate judge with unusual and complex matters presenting novel questions of fact and law.[13]

---

**13.** These cases were not submitted until April 4, 1991, the day I heard oral argument in both cases.